## 38372. KESLER v. THE STATE.
## 38484. CRUMPLER v. THE STATE.

HILL, Presiding Justice.

Jimmy Woodson Kesler and Clark Doster Crumpler appeal their convictions and life sentences imposed by the Superior Court of Dodge County for the murder of Jan Veal Evans, a 21-year-old divorcee employed at the factory managed by defendant Kesler.

At trial, the state's chief witness was co-indictee Johnny Michael Faircloth, who was granted immunity from prosecution in exchange for his testimony. The state's theory of the case was that defendant Kesler enlisted the aid of defendant Crumpler to kill the victim and that Crumpler in turn enlisted the aid of Faircloth. Faircloth testified that in the latter part of April 1979, at a time when he and his wife had just divorced and he was mad at the world, defendant Crumpler came to his place of employment in Warner Robins and asked him to help him kill someone. He agreed because of the hate he felt and as a favor to his friend. No action was taken for about three weeks, until Thursday, May 24, 1979, when defendant Crumpler, with his ward, Melinda McMullen, and another friend, Emory Spring, picked up Faircloth in a pool hall in Warner Robins and took him to Milan in Dodge County in defendant Kesler's blue Cadillac. They drove to defendant Crumpler's sister's house and left Melinda, then went across the street to defendant Jimmy Kesler's house. Defendant Crumpler showed Faircloth around defendant Kesler's house and made a call to Eastman to the victim's apartment, but did not reach her. A copy of defendant Kesler's phone bill indicates such a call was made at about 4:30 in the afternoon.[1] Defendant Kesler then arrived at the house and, after a conversation between defendants Kesler and Crumpler, Crumpler and Faircloth left. They spent the night at defendant Crumpler's trailer in Rhine.

On Friday morning, May 25, 1979, after they took Melinda to catch the school bus, they placed some beer, a metal club with white tape covering it, a brown paper bag containing marijuana, and some gloves in the trunk of defendant Crumpler's green Chevrolet which already contained a concrete block and a chain. Defendant Crumpler and Faircloth drove down the Eastman highway hoping to intercept

---

[1] A friend of the victim testified that between 3:30 and 4:30 that day, she answered the victim's phone at the victim's request and told the male caller, who had a gruff voice, that the victim was not there.

the victim on her way to work. They did not see her.

After they bought gas and some liquor, they went to a restaurant in Rhine to eat, and to the factory in Milan at which defendant Kesler worked. Defendant Crumpler went in and when he returned reported that the victim would be at defendant Kesler's house. Defendant Kesler and another man in a van passed them en route. They stopped and spoke and defendant Kesler got out of the van and looked in the trunk of defendant Crumpler's car.

When Faircloth and defendant Crumpler arrived at defendant Kesler's house, they began calling and searching for the victim. They found her behind a door in the laundry, and defendant Crumpler gave her the marijuana "she wanted to try." As she walked away from them with the bag, defendant Crumpler gave Faircloth the sign to hit her over the head. Faircloth knocked her to the floor and held her down while defendant Crumpler started choking her. Crumpler put the club over her throat and stood on it, rolling back and forth, saying, "Die, you little bitch, die," until she strangled. (Dr. Larry Howard's autopsy corroborated Faircloth's statement as to the cause of death.) The body was then put in the trunk of the green Chevrolet. Faircloth followed defendant Crumpler in the victim's car to a dirt road outside of Milan where he drove her car into the woods. The brown bag of marijuana was left in it.

They then proceeded to a river in which to dump her body, but, seeing someone there, they drove to Turnpike Creek in Telfair County and threw her body into the creek with the cement block chained to her legs. A piece broken off a cement block and a broken chain link, which matched the chain wrapped around the victim's body, were later found in defendant Crumpler's car. As they left, they met the van with defendant Kesler and another man in it. Faircloth reported that defendant Kesler asked him how things had gone, to which he replied, "Yeah, she sank like the Titanic." Later, on their way again, defendant Crumpler handed Faircloth $400 with a promise of more to come around Christmas (Faircloth later testified, as did Melinda McMullen, that he did receive more money and a good price on an El Camino truck from defendant Crumpler, which he considered to be payments for helping to kill the victim.)

On the way back to Warner Robins, Faircloth threw the victim's pocketbook in the Ocmulgee River near Bonaire. When it merely floated on the surface, Faircloth jumped into the water and sank it. (In February 1981, divers retrieved the bag and several objects from it at the spot described by Faircloth.)

Faircloth remained silent as to the incident when questioned by investigators until he heard that defendant Crumpler had implicated him as the murderer. Then, in January 1981, he agreed to testify in

exchange for immunity.

Other testimony was also introduced as follows: R. C. Thompson said he rode to Warner Robins with defendant Crumpler who talked to someone at an insulation company. Jack Humphrey, owner of the Warner Robins insulation company where Faircloth worked, testified that defendant Crumpler came to see Faircloth on two occasions, once in a blue Cadillac and once in a Corvette, but that Faircloth was not there. Humphrey also presented his work records showing that Faircloth was absent from work on Thursday and Friday, May 24 and 25, 1979.

Terry Lupin testified that he went to defendant Kesler's house with Billy Smith, a friend of defendant Kesler, to pick up a truck in June 1979. At that time, defendant Kesler, Faye Brown Floyd, Tommy Baker, Lupin and Smith were visiting when defendant Crumpler came in quite drunk. Lupin stated that defendant Crumpler made the statement that he had killed the victim and that he expected to be arrested the next morning when he was to report to the sheriff's department. Defendant Kesler told defendant Crumpler to go home. Then defendant Crumpler said to Mrs. Floyd she better watch her step or she would wind up in the creek, too. Smith, Floyd and Baker all testified for the defense. They all denied hearing any such statement by defendant Crumpler that he had killed the victim and expected to be arrested. They also consistently stated that defendant Crumpler had joked to Baker that if Mrs. Floyd ended up in the creek, they would all know who did it (i.e., killed the victim).

In deciding this appeal, we first consider the sufficiency of the evidence as to each defendant (Divisions 1 and 2), then we will address other enumerations of error common to both appeals (3 through 6) before deciding those issues raised by defendants Kesler (7 through 9) and Crumpler (10 through 16), individually.

## Sufficiency of the Evidence

1. In his appeal, defendant Crumpler enumerates as error that the verdict is contrary to law and unsupported by the evidence. At trial, defendant Crumpler said he had known Faircloth since they had worked in a construction job together in Warner Robins in 1972 and 1973. He considered Faircloth a friend, that on Wednesday, May 23, 1979, he went to Warner Robins to see Faircloth, who wanted him to appear in court with him because his mother was upset with him and would not go, but that defendant Crumpler had gone on the wrong day. With Melinda, in defendant Kesler's blue Cadillac, he visited his friend Emory Spring; then stopped by a pool hall to get a beer, where he ran into Faircloth. Faircloth said he wanted to get away for awhile and asked defendant Crumpler to take him home to

Rhine with him. In Rhine, Faircloth helped defendant Crumpler move into his new trailer on Thursday, May 24. On Friday, May 25, defendant Crumpler loaned Faircloth his green Chevelle to run some personal errands, while defendant Crumpler himself went about his usual morning schedule. When he returned home later that day, he found Faircloth there and very nervous. Faircloth indicated he had raped[2] and killed the victim in a drug deal because she was going to "rip him off" and that she was now at the bottom of the river. Defendant Crumpler never reported this to the police because he was afraid of Faircloth and his "connections." Defendant Crumpler also stated that he kept blocks and chains to tie up his Doberman dogs, and that he had called Jack Humphrey's insulation business from defendant Kesler's telephone to get prices for insulating defendant Kesler's home. We find, however, that a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U. S. 307, 319 (99 SC 2781, 61 LE2d 560) (1979); *Tucker v. State,* 249 Ga. 323 (290 SE2d 97) (1982). Faircloth's testimony about Crumpler's participation in the murder is corroborated by the pieces of cement block and chain found in his car and his statement to Terry Lupin.

2. Defendant Kesler concedes that, except for Code Ann. § 38-121, Faircloth's testimony is sufficient to support the verdict against him. See Jackson v. Virginia, supra, 443 U. S. at 319. He argues strenuously, however, that in view of Code Ann. § 38-121, the evidence is insufficient to convict him. Code Ann. § 38-121 provides: "The testimony of a single witness is generally sufficient to establish a fact. Exceptions to this rule are made in specified cases; such as . . . in any case of felony where the only witness is an accomplice . . . — in these cases . . . corroborating circumstances may dispense with another witness." At common law, a defendant could be convicted on the uncorroborated testimony of an accomplice. *Stone v. State,* 118 Ga. 705 (4) (45 SE 630) (1903). A rule of practice, that juries be advised not to convict on the uncorroborated testimony of an accomplice, *Stone v. State,* supra, has become a law in this state. The law has been made more stringent by the requirement, not contained in the Code, that the accomplice's testimony as to the identity and participation of the defendant on trial be corroborated. *West v. State,* 232 Ga. 861 (2) (209 SE2d 195) (1974). However, as was acknowledged in *West v. State,* supra, ". . . insofar as the participation and identity

---

[2] The autopsy report showed that the victim had had sex within 12 to 72 hours before her death. Dean Marchant testified he had last seen the victim the afternoon before she died, at which time he had had intercourse with her.

of the accused is concerned, there must be independent corroborating evidence which tends to connect the *accused* with the crime." The independent corroborating evidence "which tends to connect the accused with the crime" may be circumstantial evidence, which circumstantial evidence need not be sufficient in and of itself to support a verdict of guilty. *Gunter v. State,* 243 Ga. 651, 655 (256 SE2d 341) (1979). See also *Birt v. State,* 236 Ga. 815, 826 (225 SE2d 248) (1976). Corroboration is peculiarly a matter for the jury and circumstantial evidence tying the defendant to the crime and justifying an inference of guilt is sufficient to corroborate an accomplice's testimony. *Gunter v. State,* supra; *Birt v. State,* supra.

There are several facts here which the jury would have been authorized to consider as corroborating Faircloth's testimony regarding defendant Kesler. Although not directly pertinent, we start with motive. The state's theory for defendant Kesler's motive for the killing was his dislike of the victim's increasingly serious relationship with his friend and business partner Dean Marchant, who was married.

Dean Marchant testified that defendant Kesler did not want him to have a public affair with the victim because he was married, and had once chastized them for playing footsies while at dinner at the Ramada Inn. He said that either he or defendant Kesler had paid for an abortion for the victim, who was pregnant by Marchant, and that defendant Kesler continually walked in the bedroom while he and the victim were having sex at defendant Kesler's house, although Marchant had had sex with about ten other women there, also.

Don Gatliff, a car mechanic, who started his own business in Milan with the help of defendant Kesler, who wanted him close by to help with his racing cars, stated that he was with defendant Kesler, the victim, and Dean Marchant at a Ramada Inn in December 1978. When defendant Kesler caught the victim and Marchant playing footsies, he called her a bitch and jerked her by the arm so hard she started crying. In April 1979, he rode with defendant Kesler past the victim's Eastman apartment. Defendant Kesler asked Gatliff how he could keep the victim and Marchant apart. The victim and Marchant were, however, seeing each other more frequently.

Nan Skipper related that she talked to defendant Kesler a month to a month and half before the victim's death. She said that defendant Kesler called her to enlist her aid in getting Dean away from the victim, saying that they were getting too close and that he didn't like it. Skipper had been seeing Marchant off and on since 1974.

Defendant Kesler testified that the victim worked at the factory he managed, that they were friends and that he had bought her a

washer and dryer for Christmas and that she had gone with him to New York City and on other trips. He denied that he had earlier told a police investigator that the victim was growing away from him and was no longer as close to him and as caring as she once had been.

We turn now from evidence of motive to evidence corroborating Faircloth's testimony as to Kesler's participation in the crime. The jury was authorized to find that defendant Crumpler used defendant Kesler's Cadillac to bring Faircloth from Warner Robins to Milan and that Kesler's telephone had been used to contact Faircloth. Defendant Kesler's telephone records show phone calls were made from his telephone to Faircloth's mother's home and to Faircloth's place of employment.[3] Someone using Kesler's phone called Faircloth's employer on May 23, 1979, looking for Faircloth. While there is no evidence that defendant Kesler made these calls himself, the jury was authorized to consider that these calls were made on Kesler's telephone.

The jury was also authorized to find that defendant Kesler took action to cause a potential witness to leave the scene of the murder before it took place. Wade Clark testified that he was washing a car at defendant Kesler's home about 8:30 or 9:00 a.m. on Friday, May 25, the day of the murder, when defendant Kesler told Clark he'd have to leave because he expected a paving company to be paving that area and did not want it wet. The area has never been paved, although witness Clark testified that men had measured the area for paving the day before when defendant Kesler was not at home.

Judy Ragan, a neighbor of the victim, stated that she drove the victim in the victim's car to their accounting class on Thursday night. She had to let the driver's seat back in order to drive and there was no brown bag of marijuana on the floor under the driver's seat at that time. GBI Agent Terry Crowell testified that he found the brown bag with marijuana in it, which was rolled up inside another brown bag, under the driver's seat of the victim's car during an inventory search of the vehicle after the homicide. A fingerprint expert testified that he found defendant Kesler's left thumbprint on the inner brown bag containing the marijuana. Defendant Kesler testified that the last time he saw the victim alive was on Thursday afternoon when she had come to his house to meet Dean Marchant and that they had stayed about an hour and left.

Don Gatliff also testified that 2 or 3 weeks after the victim's death, defendant Crumpler was in his shop grumbling about the GBI

---

[3] Defendants Kesler and Crumpler challenge the admissibility of these records in another enumeration of error. See Division 5, infra.

investigations and all the questions he had been asked. Teasingly, he said to defendant Crumpler: "Well, Doster how much did Jimmy pay you to do that anyway?" Defendant Crumpler got hostile and jumped in the car and left. About 15 minutes later, defendant Kesler came in "jumping on me. He said that he had enough trouble with the GBI's coming around there asking him questions and everything, and what did I mean by saying that to Doster." Defendant Kesler does not deny the statement, but contends he told Gatliff he should not be making such comments, especially about the death of a friend, the next time he saw Gatliff and did not make an immediate, special trip to his shop to confront him.

Defendant Kesler admitted driving his van on the morning of May 25 but denied seeing Crumpler and Faircloth. The jury was authorized to believe the former and reject the latter. Marchant said that he was with Kesler in the van.

Since we find evidence to support the jury's finding that accomplice Faircloth's testimony was corroborated under Code Ann. § 38-121, we hold that the trial court did not err in refusing to grant defendant Kesler's motion for judgment notwithstanding the verdict or his motion for new trial.

### Other Common Enumerations of Error

3. Both defendants Kesler and Crumpler raise the question whether the trial court erred in denying them bonds on the ground that they were thereby unable to aid their attorneys in preparing their case. Normally the denial of bail before trial would be moot after conviction. See *Lane v. State,* 247 Ga. 387 (276 SE2d 644) (1981). Here, however, the defendants seek a new trial because they say they were unable to assist their counsel in locating and interviewing witnesses. A defendant is entitled to the effective assistance of counsel, but no case or other authority has been cited for the novel proposition that a defendant is entitled to bail in order to personally assist his counsel. We find no error here.

4. Defendants Kesler and Crumpler next enumerate as error the denial of their motion for severance. Only defendant Kesler made such a motion at trial.

They first argue that the prosecutor could not indict all three defendants together and then, in effect, without leave of court, sever the trial of Faircloth by a prior grant of immunity without also granting defendant Kesler a separate trial. Immunity was granted to Faircloth by the trial court's order as required by Code Ann. § 38-1715. The rule that indictments returned by the grand jury are not amendable by the district attorney is not violated by the grant of immunity as provided by law. Furthermore, the law contemplates

that "when indicted for a capital felony when the death penalty is waived . . . defendants may be tried jointly *or separately* in the discretion of the trial court; in any event either defendant may testify for the other *or on behalf of the state.*" (Emphasis supplied.) Code Ann. § 27-2101. *State v. Connelly,* 138 Ga. App. 121 (225 SE2d 519) (1976), is not applicable by converse reasoning.

In addition, defendant Kesler argues that trying him with defendant Crumpler, against whom there was more evidence, created "guilt by association" and thereby made it more likely that defendant Kesler would be convicted than if he had been tried separately. We find no abuse of discretion under the criteria set out in *Cain v. State,* 235 Ga. 128 (218 SE2d 856) (1975), and *Orkin v. State,* 236 Ga. 176, 193 (223 SE2d 61) (1976), where a conspiracy is shown, where the defenses of the co-defendants being tried are not antagonistic, and where, as here, the jury is carefully instructed on conspiracy and to consider the state's case against each defendant separately.

5. Both defendants also assert as error the failure by the trial court to suppress the telephone records of defendant Kesler and their admission into evidence at trial. These records were obtained from Continental Telephone Company through an order from the superior court at the request of the former district attorney on June 9, 1979, during the investigation of the victim's death.[4] The defendants contend that this seizure of their private records without probable cause was a violation of their fourth amendment rights and that the records should have been suppressed. In so arguing, the defendants seek to distinguish *Culpepper v. State,* 156 Ga. App. 331 (1) (274 SE2d 616) (1980), which relied on United States v. Miller, 425 U. S. 435 (96 SC 1619, 48 LE2d 71) (1976), in holding that a bank customer has no reasonable expectation of privacy in his bank records to make them protectable under the fourth amendment and thus no standing to challenge a subpoena to the bank requiring their production. The defendants urge that bank records are different because the bank is a party to the transaction and that checks written on one's account are negotiable instruments placed into the stream of commerce with no expectation of privacy.

We, however, find United States v. Miller, supra, 425 U. S. 435, and *Culpepper v. State,* supra, 156 Ga. App. 331, controlling. Like bank records, telephone toll and billing records are not owned or

---

[4] The letter to the telephone company from the former district attorney stated: "You are not to disclose the existence of this request for a period of ninety days from the date of this request. Any such disclosure could impede the investigation being conducted and thereby interfere with the enforcement of the law."

possessed by the defendant, but are business records belonging to the telephone company. United States v. Baxter, 492 F2d 150, 167 (9th Cir. 1973). Katz v. United States, 389 U. S. 347 (88 SC 507, 19 LE2d 576) (1967), urged by the defendants, recognizes the right of privacy in the contents of the telephone *conversation,* not in the toll and billing records of the telephone company. Thus, neither defendant Crumpler, as one user of the telephone, nor defendant Kesler, as its lessee, have standing to object to the production of these records by the telephone company. We decline to accept the defendant's suggestion that we extend Code Ann. §§ 26-3001, 26-3007, applicable to the content of telephone conservations, to include telephone company records. It follows that the trial court did not err in refusing to suppress them or in admitting them into evidence at the trial.

Having so concluded, we find that defendant Kesler lacks standing to challenge the superior court's order and the prosecutor's letter to the telephone company compelling production of these records.

Defendant Crumpler also argues error in admitting the telephone records because the state failed to provide these records to him in response to his motion to produce. Code Ann. § 38-801 (g); *Brown v. State,* 238 Ga. 98 (231 SE2d 65) (1976). The state counters that the telephone records were properly admitted despite its failure to comply with this request because the records were equally accessible to the defense. We note, however, that these were defendant Kesler's telephone records and it is defendant Crumpler who specifically requested this information from the state in his motion to produce. The record reveals that the telephone company's policy is to protect these records from general access except with the consent of the customer or a subpoena. Therefore, there is no merit to the state's argument that these records were otherwise accessible to defendant Crumpler.

The state should have provided this information to defendant Crumpler at the commencement of the trial pursuant to his motion to produce. In this instance, however, we find the error harmless because the records were produced during the trial and the court offered Crumpler an opportunity to examine them and because he has not shown how he was prejudiced by the state's failure to produce the information at the beginning of the trial.

6. Under the circumstances, we do not find error, as urged by defendants Kesler and Crumpler, in granting the state's motion to excuse for cause two prospective jurors who were employees of the Heckler Corporation plant where defendant Kesler was the manager, with the power to discharge employees. See *Central R. Co. v. Mitchell,* 63 Ga. 173, 179 (1879); *Atlantic C. L. R. Co. v. Bunn,* 2 Ga.

App. 305 (2) (58 SE 538) (1907). Although the cases cited were civil cases and the employers were corporations, we find the reasoning of those decisions applicable in criminal cases and to an individual defendant with the power to discharge emloyees of a corporate employer who serve as jurors. See also *Carr v. Carr,* 240 Ga. 161, 162 (240 SE2d 50) (1977).

On the other hand we do not find that the trial court erred in refusing to excuse juror Hall, who stated her view that she could exclude any opinions she formed from reading newspaper articles on the case. *Tennon v. State,* 235 Ga. 594 (2) (220 SE2d 914) (1975); *Taylor v. State,* 243 Ga. 222 (2) (253 SE2d 191) (1979). Furthermore, neither defendant exhausted his peremptory strikes. *Bridges v. State,* 242 Ga. 251 (3) (248 SE2d 647) (1978); *Foster v. State,* 240 Ga. 858, 859 (242 SE2d 600) (1978).

### Defendant Kesler's Enumerations of Error

7. Defendant Kesler next raises the failure of the court to change venue upon his pretrial motion. The Sixth Amendment provides that "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury. . . ."[5]

The state Constitution similarly provides that "Every person charged with an offense against the laws of this State . . . shall have a public and speedy trial by an impartial jury." Code Ann. § 2-111. The right to an "impartial jury" is set forth in both constitutions.

Code § 27-1101 provides that criminal cases shall be tried in the county where the crime was committed "except cases in the superior courts where the judge is satisfied that an impartial jury cannot be obtained in such county." Code § 27-1201, et seq., provide the procedure for obtaining a change of venue in criminal cases where "an impartial jury cannot be obtained in the county where the crime is alleged to have been committed." Code § 27-1201. The phrase "impartial jury" appears in the constitutions and the Code sections. Being the same, these phrases should be interpreted as meaning the same thing. See *Carter v. State,* 238 Ga. 446, 447 (233 SE2d 201) (1977).

In *Street v. State,* 237 Ga. 307, 311 (227 SE2d 750) (1976), we concluded regarding motions for change of venue "that under the decisions of the Supreme Court of the United States, to find that the petitioner did not receive a fair trial, petitioner must show (1) that the

---

[5] The Sixth Amendment right to trial by jury in criminal cases is applicable to the states. Duncan v. Louisiana, 391 U. S. 145, 149 (88 SC 1444, 20 LE2d 491) (1968); see also Irvin v. Dowd, 366 U. S. 717, 722 (81 SC 1639, 6 LE2d 751) (1961).

setting of the trial was inherently prejudicial or (2) that the jury selection process showed actual prejudice to a degree that rendered a fair trial impossible." The second test involves review of the voir dire examination of potential jurors. See *Mooney v. State,* 243 Ga. 373, 387-388 (254 SE2d 337) (1979). Conceding that the voir dire here does not show actual prejudice, Kesler urges that the setting of the trial was inherently prejudicial. However, the empanelling of fair and impartial jurors, as demonstrated on voir dire, makes it particularly difficult to show that the setting of the trial was inherently prejudicial. See *Potts v. State,* 241 Ga. 67 (8) (243 SE2d 510) (1978). Nevertheless we turn to that aspect of *Street v. State,* supra.

Traditionally, a defendant seeking a change of venue on the basis that the setting of the trial is inherently prejudicial relies heavily if not primarily or exclusively on news media reports, particularly newspapers (because they are easier to collect). However, widespread or even adverse publicity is not in itself grounds for a change of venue. United States v. McNally, 485 F2d 398, 403 (8th Cir. 1973), cert. denied 415 U. S. 978 (1974); *Mooney v. State,* supra, 243 Ga. 373, 387. On appeal, the impact of media publicity is evaluated by various factors, such as the size of the community and the extent of media coverage (number of articles and their circulation); whether it related to the discovery of the crime (e.g., facts regarding the victim) or to the apprehension or interrogation of the defendant (and whether any publicized confession was admitted at trial); the prominence and content of the reports (e.g., facts vs. speculation and emotionalism, and the accuracy and admission into evidence of those facts); and the time interval between the publicity and the trial. Stroble v. California, 343 U. S. 181, 191-195 (72 SC 599, 96 LE 872) (1952); *Mooney v. State,* supra, 243 Ga. at 385-387; *Brooks v. State,* 244 Ga. 574, 578-581 (261 SE2d 379) (1979). Although some of these considerations cannot be resolved until the evidence is closed, on appellate review the impact of the pretrial publicity of evidence and the admission of evidence can be compared. See Stroble v. California, supra, 343 U. S. at 195.

In support of his contention, Kesler cites the amount of pretrial publicity and local interest in the case as reflected by the newspaper articles, the fact that the district attorney held a news conference, the number of phone calls and letters received by the sheriff's office, that 300 people, mostly local, were interviewed during the investigation, that a local senator requested that the Governor establish a reward fund to which local contributions were offered, and that Faircloth was secreted away while awaiting the trial. The trial court, after a hearing, denied the motion for change of venue.

We reiterate here that the crime was committed on Friday, May

25, 1979, and the body was found on Tuesday, May 29, 1979, while defendants Kesler and Crumpler were not arrested until January, 1981. The trial was held in April 1981. Much of the newspaper publicity, the offer of a reward and widespread interviewing of witnesses thus occurred 2 years before the trial. We find no abuse of discretion in denying defendant Kesler's motion for change of venue. *Potts v. State,* supra.

8. Defendant Kesler next urges that the trial court abused its discretion in limiting the voir dire questions of prospective jurors. We find no abuse of discretion. See *Lamb v. State,* 241 Ga. 10 (1) (243 SE2d 59) (1978).

9. There is no merit to defendant Kesler's remaining enumerations of error. The evidence objected to was relevant to the state's case on the issue of motive (see division 2) and was not inadmissible because it may have incidentally placed the defendant's character in issue.

### Defendant Crumpler's Enumerations of Error

10. Defendant Crumpler also cites error in the refusal of the state to provide, at the beginning of the trial under his notice to produce, the grand jury testimony of witness Faye Brown Floyd. At trial, she was a witness for the defense, who testified contrary to state's witness Terry Lupin, that during one evening when she, Lupin, Billy Smith and Tommy Baker were at defendant Kesler's home, defendant Crumpler had come in drunk, but had not said that he had to be at the sheriff's office the next day and that he expected to be arrested. Defendant Crumpler claims that he was prejudiced by the state's refusal to provide to him her grand jury testimony because the state used that information, to which he did not have access, to cross examine her.[6]

At trial, the district attorney asked whether defendant Crumpler generally fit in with defendant Kesler's circle of friends. She answered, no. The district attorney then used her grand jury testimony to show how she had previously answered the question: "I would say not. I could never understand why he would go over there because he was such a scary person." Upon objection to the use of this unproduced grand jury testimony, the district attorney offered to turn over to the defense the one page referred to in his cross examination. Defendant Crumpler did not avail himself of this offer, but insisted on production of her entire testimony under his notice to produce. The trial court refused. He asserts that this ruling was

---

[6]*Rini v. State,* 235 Ga. 60 (1) (218 SE2d 811) (1975) is not applicable here.

erroneous.

Testimony before the grand jury has traditionally been unavailable to criminal defendants in this state. "The grand jury as a public institution serving the community might suffer if those testifying today knew that the secrecy of their testimony would be lifted tomorrow. This 'indispensable secrecy of grand jury proceedings,' United States v. Johnson, [319 U. S. 503] supra, at p. 513, must not be broken except where there is a compelling necessity." United States v. Procter & Gamble, 356 U. S. 677, 682 (78 SC 983, 2 LE2d 1077) (1958). No compelling necessity having been shown, we do not feel compelled to re-evaluate our state rule here.

11. Defendant Crumpler next urges error in the refusal of the trial court to admit Faircloth's Central State Hospital medical records under Code Ann. §§ 38-712 thru 38-716.[7] As we said in *Moody v. State,* 244 Ga. 247, 249 (260 SE2d 11) (1979), "Records which contain diagnostic opinions, conclusions and other statements of third parties not before the court are still not admissible if tendered in toto though relevant portions of such records not subject to such defects may be." Faircloth's records consisted of 59 pages plus the certificate of the custodian and the defense sought to introduce eight pages or parts thereof. The trial court admitted one page and excluded the remaining requested pages on the grounds that they contained conclusions, opinions, interpretations of third persons, uninterpreted symbols and abbreviations, and references to criminal or unlawful conduct. We find no abuse of discretion. *Moody v. State,* supra, 244 Ga. at 249.

12. Defendant Crumpler also enumerates as error that the trial court appointed the public defender, rather than his retained trial counsel, to handle his indigent appeal. Although the sixth amendment guarantees every defendant the aid of an attorney, that attorney need not be the counsel of the defendant's choosing. *Bailey v. State,* 240 Ga. 112, 114 (239 SE2d 521) (1977). We find no abuse of discretion.

13. Defendant Crumpler's remaining enumerations of error, including his challenges to several jurors, do not show reversible error.

*Judgments affirmed. All the Justices concur.*

---

[7] "Medical records, or reproductions thereof, when duly certified by the custodians thereof need not be *identified* at the trial and may be used in any manner in which records identified at the trial by the custodian could be used." (Emphasis supplied.) Code Ann. § 38-713 (a).

DECIDED MAY 18, 1982 —
REHEARING DENIED JUNE 2, 1982 IN CASE NO. 38372.

*B. W. Walker, Groover & Childs, Denmark Groover, Jr.,* for appellant (case no. 38372).

*Dennis Mullis,* for appellant (case no. 38484).

*James L. Wiggins, District Attorney, Tony H. Hight, Michael J. Bowers, Attorney General, Janice G. Hildenbrand, Staff Assistant Attorney General, Virginia H. Jeffries,* for appellee.