39080. CASTELL v. THE STATE.

MARSHALL, Presiding Justice.

Stephens County Tax Commissioner Elizabeth Williams was murdered at her home early in the morning of July 31, 1980. After investigation, authorities suspected that former Tax Commissioner Donald Addison and Raymond McJunkin had hired John Michael Jones and the defendant in this case, James Everett Castell, to kill Mrs. Williams. The four of them were jointly indicted but tried

separately. Castell was tried first, convicted, and sentenced to death.[1] Jones was convicted and given a life sentence. His conviction was affirmed in *Jones v. State,* 250 Ga. 11 (295 SE2d 71) (1982). Addison and McJunkin were acquitted.

Jones was the state's key witness against Castell. He testified as follows. Castell and Jones were residents of South Carolina. At Castell's request, Jones drove him to Roger Dean's garage in Toccoa, Georgia, the Sunday before Mrs. Williams was killed. They returned Monday. Donald Addison was at the garage Monday, and after introducing him to Jones, Castell took Addison out of Jones' hearing and talked to him for several minutes. Later, Castell retrieved an envelope, containing $1,000 in $100 bills, from Raymond McJunkin's wrecker. Castell gave Jones $100. They returned Tuesday and Castell picked up an additional $500. At Castell's request, Jones again drove Castell to Toccoa early Thursday morning. When they arrived in Toccoa, they stopped and Castell made a call from a public telephone. Then he directed Jones to Mrs. Williams' residence. Jones parked in the driveway. Castell went to the front door and Mrs. Williams let him in. Jones heard a scream and then two shots. Castell exited the house, used his shirt to wipe off the doorknob, and came back to the car. They drove back to South Carolina, but returned to Toccoa the same day; Castell said he needed to pick up more money. On the way in, Castell threw his pistol into Lake Hartwell.[2] Jones dropped Castell off at Roger Dean's garage, returned later, and the two drove back to South Carolina. Castell gave Jones an additional $200 for getting him involved.

Jones' testimony as to Castell's participation was corroborated primarily by Burris Holbrooks, who testified as follows. Holbrooks worked in July and part of August, 1980, at Roger Dean's garage. Sometime during the third week in July, Addison, whom Holbrooks had known for 12 to 15 years, approached Holbrooks and asked him if he would break into the tax office and destroy records. Addison said that when the books were audited, he wanted it to look as though Mrs. Williams was trying to hide something. Holbrooks told Addison that he wouldn't do it. Later, Addison, who was running for tax commissioner, said the only way he could get elected was to get rid of Mrs. Williams. He asked Holbrooks if he would kill her for $1,500.

---

[1] Castell was indicted August 12, 1980, and his case was *not* tried under the Georgia Unified Appeal Procedure.

[2] Divers found the pistol. A ballistics comparison, of a test bullet fired from the gun and a bullet recovered from the body of Mrs. Williams, established the pistol as the murder weapon.

Holbrooks again refused. Holbrooks later observed Addison talking to McJunkin and Castell. A day or two later, Addison told Holbrooks that Castell was his man and the job would be done before Friday. At lunchtime on Thursday, the day of the murder, Holbrooks observed the arrival of Jones and Castell at Roger Dean's garage. Castell made a telephone call. Ten or 15 minutes later, Addison arrived and talked with Castell, out of Holbrooks' hearing. When Holbrooks heard that Mrs. Williams had indeed been murdered, he went to the authorities with the foregoing information.

In addition to the foregoing, the state offered evidence that on July 28, 1980, the Bank of Toccoa had loaned Addison $1,500; that during July and early August, 1980, a number of long distance telephone calls had been placed from the residence of T. R. McJunkin to that of Joan Chapman (Castell's ex-wife, with whom he was living at the time), and vice versa; and that when Castell was arrested on August 12, he had seven $100 bills in his back pocket.

Castell testified that he did not kill Mrs. Williams; that he and Jones came to Georgia on the afternoon of July 31 because Jones wanted to see McJunkin about getting his job back; that the $700 in his pocket was part of $1,100 he had borrowed from his sister in the latter part of July to purchase a truck; and that, because his credit was no good, McJunkin was going to co-sign the note on the truck.

Mrs. James Williams testified that she observed one of the defendant's sisters lend him $1,100, in $100 and $20 bills. Vicki Castell (the defendant's sister-in-law) testified that, in July of 1980, she was living with Dale Upton and Michael Jones. Jones and Upton left the house together at 6:00 a.m. on the 31st and returned about dinner time. Mary Watkins (defendant's sister, but not the one who allegedly loaned him $1,100) testified that Jones had a reputation for violence and dishonesty.

1. We address, first, the defendant's contentions that the declarations of alleged co-conspirator Addison were erroneously admitted, that the state failed to sufficiently corroborate the testimony of co-defendant Jones, and that the evidence was insufficient to support the verdict.

(a) If a prima facie case of conspiracy is shown on the whole evidence, exclusive of declarations by an alleged co-conspirator, it is not error to admit such declarations over an objection that they are inadmissible hearsay. OCGA § 24-3-5 (Code Ann. § 38-306); *Knight v. State,* 239 Ga. 594 (2) (238 SE2d 390) (1977); *Fallings v. State,* 232 Ga. 798 (1) (209 SE2d 151) (1974).

We do not agree with the defendant that, aside from the declarations, the only evidence of a conspiracy was "Jones witnessing the appellant and Addison conversing together, and the Addison

bank loan." The circumstances, considered in their entirety, include: (a) several trips by Castell to Roger Dean's garage, where he obtained at least $1,500 in $100 bills from McJunkin's truck; (b) conversations between Addison and Castell, one of which occurred immediately prior to Castell's receipt of $1,000 and another of which occurred on the afternoon of the murder after Castell had made a special trip back to Toccoa; (c) payment of $300 by Castell to Jones; (d) the loan of $1,500 by the Bank of Toccoa to Addison, three days before the murder; (e) a number of long-distance telephone calls between McJunkin and Castell shortly before and after the murder; and (f) the seven $100 bills in Castell's back pocket when he was arrested.

The evidence of conspiracy was sufficient to allow the introduction of declarations of the alleged co-conspirator Addison under OCGA § 24-3-5 (Code Ann. § 38-306).

(b) The defendant contends that if the admission of these declarations did not violate OCGA § 24-3-5 (Code Ann. § 38-306), it violated his Sixth Amendment right to confrontation. See Dutton v. Evans, 400 U. S. 74 (91 SC 210, 27 LE2d 213) (1970).

We note, first, that the defendant's right of confrontation was not abridged by Holbrooks' testimony that Addison had requested Holbrooks' assistance in committing a burglary and had offered him $1,500 to murder Mrs. Williams. The importance of these statements lies in the fact that they were made; it does not depend upon the veracity of the out-of-court declarant, Addison.[3] "Neither a hearsay nor a confrontation question would arise [from use of testimony] to prove merely that the statement had been made. The hearsay rule does not prevent a witness from testifying to what he has heard; it is rather a restriction on the proof of fact through extrajudicial statements. From the viewpoint of the Confrontation Clause, a witness under oath, subject to cross-examination, and whose demeanor can be observed by the trier of fact, is a reliable informant not only to what he has seen but also to what he has heard." Dutton v. Evans, supra, 400 U. S. at p. 88 (footnote omitted).

The confrontation issue arises in this case because the jury was invited to infer that Addison had implicitly identified Castell as the murderer when he told Holbrooks that Castell was his man and the job would be done before Friday. The thrust of Dutton v. Evans, supra, is that in cases involving a co-conspirator exception to the hearsay rule, the admission of the statement of a co-conspirator does not violate the confrontation clause if the statement and the circumstances surrounding it contain sufficient "indicia of reli-

---

[3] See McCormick on Evidence, Ch. 24, § 249 (2d Ed. 1972).

ability." *Mooney v. State,* 243 Ga. 373 (3) (254 SE2d 337) (1979).[4]

Dutton v. Evans identified at least four factors indicative of reliability: " '(1) [T]he declaration contained no assertion of a past fact, and consequently carried a warning to the jury against giving it undue weight; (2) the declarant had personal knowledge of the identity and role of participants in the crime; (3) the possibility that the declarant was relying upon faulty recollection was remote; and (4) the circumstances under which the statements were made did not provide reason to believe that the declarant had misrepresented the defendant's involvement in the crime.' " United States v. Fielding, 630 F2d 1357, 1368 (9th Cir. 1980).

All of these factors are present in this case. We conclude that the defendant's Sixth Amendment rights were not violated by introduction of Addison's declarations.

(c) In Georgia, a defendant may not be convicted on the un-corroborated testimony of an accomplice. OCGA § 24-4-8 (Code Ann. § 38-121). The corroboration must be independent of the accomplice's testimony and it must connect the defendant to the crime or lead to the inference that he is guilty. *Allen v. State,* 215 Ga. 455 (111 SE2d 70) (1959). "However, the corroborating evidence need not of itself be sufficient to warrant a conviction of the crime charged. [Cit.] Slight evidence from an extraneous source identifying the accused as a participant in the criminal act is sufficient corroboration of the accomplice to support a verdict. [Cit.]" *Reaves v. State,* 242 Ga. 542, 543 (250 SE2d 376) (1978).

The corroborating evidence in this case included telephone records, the presence of $700 in Castell's back pocket when he was arrested, and Addison's statements identifying Castell as "my man." This was sufficient to corroborate Jones' testimony as to Castell's involvement in the murder of Mrs. Williams.

(d) The evidence, reviewed in the light most favorable to the state, was sufficient to support the verdict. Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Next, we examine the defendant's contention that his rights under Brady v. Maryland, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963), were violated.

The defendant filed a five-page, pre-trial "motion for discovery, disclosure, inspection, and information necessary to receive a fair

---

[4] Other "hearsay exceptions rest upon such solid foundations that admission of virtually any evidence within them comports with the 'substance of the constitutional protection.' " Ohio v. Roberts, 448 U. S. 56, 66 (100 SC 2531, 65 LE2d 597) (1980).

trial," purportedly "made under the authority of Brady v. Maryland" and other cited cases, containing broad requests to disclose, information and produce documents. His final request was for all information that might be exculpatory, that might lead to exculpatory evidence, or that might benefit the defendant's preparation for trial. See *Wilson v. State,* 246 Ga. 62, 63, n. 2 (268 SE2d 895) (1980).

The trial court conducted an in-camera inspection of the state's file. The court ordered that Jones' inconsistent statements be furnished to the defendant. Otherwise, the trial court found nothing exculpatory in the state's file.

(a) We have independently reviewed the state's file, a copy of which was sealed and included in the record on appeal. We agree with the trial court that, aside from inconsistencies in Jones' statements, there was nothing exculpatory in the state's file.

(b) The prosecutor, of course, may not suppress material evidence favorable to the accused, whether or not a request for such information is made or an in-camera inspection conducted. United States v. Agurs, 427 U. S. 97 (96 SC 2392, 49 LE2d 342) (1976). Cf., *Tribble v. State,* 248 Ga. 274 (280 SE2d 352) (1981). The defendant contends that the record contains two instances of improper suppression.

First, the defendant notes that Jones stated for the first time during trial that, after the murder, Castell asked Dale Upton to burn his trousers. The defendant contends that, since this fact was not mentioned in his previous statements, it would have been useful for impeachment purposes. Whether or not this is true (the statement is inculpatory, standing alone, and it is doubtful that the defendant would have introduced it if the state had not), we find no violation of the constitutional duty to disclose, for the simple reason that the statement was not suppressed.

". . . Brady is not violated when the Brady material is available to defendants during trial. [Cits.]" United States v. Behrens, 689 F2d 154, 158 (10th Cir. 1982). "Brady does not require *pre-trial* disclosure of the materials." United States v. Sweeney, 688 F2d 1131, 1141 (7th Cir. 1982). Jones was extensively cross-examined about inconsistencies in his earlier statements (Jones originally denied any involvement in the crime) and was further cross-examined about his failure to make earlier mention of the clothes-burning (because, Jones said, he wasn't asked). Earlier disclosure would not have benefited the defense, and the delayed disclosure did not deprive him of a fair trial. *Wallin v. State,* 248 Ga. 29 (6) (279 SE2d 687) (1981).

Second, the defendant contends that certain information divulged by a Toccoa police officer to Addison's investigator in

August of 1980 was never presented to the defendant. For the gist of this information, we are referred to an affidavit by Addison's investigator, offered during the defendant's motion for new trial.[5]

"There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one . . ." Weatherford v. Bursey, 429 U. S. 545, 559 (97 SC 837, 51 LE2d 30) (1977). Brady cannot be read as requiring that "as a matter of constitutional law everything must be disclosed which might influence a jury." United States v. Orzechowski, 547 F2d 978, 985 (7th Cir. 1977). If that were the case, "the only way a prosecutor could discharge his constitutional duty would be to allow complete discovery of his files as a matter of routine practice." United States v. Agurs, supra, 427 U. S. at p. 109. Clearly, then, not every nondisclosure of exculpatory information is error. Rather, where the omitted evidence was not specifically requested, nondisclosure is error only "if the omitted evidence creates a reasonable doubt that did not otherwise exist." Id. at p. 112.

Pretermitting any question of the extent to which information in the affidavit was "known to the prosecution, but unknown to the defense," *Brown v. State,* 250 Ga. 66, 74 (295 SE2d 727) (1982),[6] we readily conclude that the information in the affidavit does not create a reasonable doubt that did not otherwise exist.[7]

---

[5] This affidavit states: "On August 21, 1980, Affiant interviewed Lt. Mack Thomason of the Toccoa Police Department who told Affiant that the original call reporting this incident came into the Toccoa Police Department to Dispatcher Marion Smith. Ptl. Green and Ptl. Jimmy Carpenter were first to the crime scene.

"Officer Thomason advised that he put out a general lookout for an automobile because Mr. O. N. Williams gave a very general description.

"Officer Thomason advised that he arrived on the scene at approximately 7:30 A.M. and proceeded to canvass the neighbors. Officer Thomason advised that Mr. O. N. Williams had gone to three houses before finding the Hunts, where he (Mr. Williams) said 'Come see Mrs. Williams.'

"Officer Thomason advised that no measurements of [sic] sketches were made of the scene at that time.

"Further, Affiant was advised that Officer Thomason received a phone call from a confidential informant, which information eventually helped to lead to the arrest of the above defendant."

[6] We cannot necessarily impute to the prosecutor knowledge possessed by a police officer.

[7] There was trial testimony that: (a) O. N. Williams returned to his house at approximately 7:30 a.m. and saw a 1973 or 1975 gray Chrysler-product car with a red or maroon top leaving his driveway; (b) After he discovered the body, Mr. Williams went to at least two houses seeking help; (c) No crime-scene measurements were made until Charles Moss arrived from the state crime lab several hours later. Trial testimony was thus quite consistent with information in the affidavit. It is not exculpatory that information was obtained from a confidential informant.

3. The defendant makes two additional contentions regarding discovery:

(a) He contends that his rights under OCGA § 17-7-210 (Code Ann. § 27-1302) were violated by the failure of the state to provide him, at least 10 days prior to the trial, with statements made by Addison. We find no error. The law relied upon by the defendant plainly states that "the defendant shall be entitled to have a copy of any statement given *by him* while *in police custody.*" (Emphasis supplied.) See *Walraven v. State,* 250 Ga. 401 (2) (297 SE2d 278) (1982). Addison's statements were not made in police custody and the defendant was, moreover, not entitled, under OCGA § 17-7-210 (Code Ann. § 27-1302), to statements made by a co-defendant.

(b) The defendant filed a post-trial motion to inspect the state's files on the cases of Donald Addison and Raymond McJunkin. By the time this motion was made, Addison and McJunkin had been acquitted. The defendant contended that these files were therefore reviewable by him, pursuant to OCGA Title 50, Ch. 18, Art. 4 (Inspection of Public Records, § 50-18-70 et seq. (Code Ann. § 40-2701 et seq.)). The state responded that, assuming its files were "public records" within the meaning of the law, these cases were still under investigation for possible federal prosecutions. On this basis, the trial court denied the defendant's motion. We find no error. *Houston v. Rutledge,* 237 Ga. 764 (229 SE2d 624) (1976).

4. The defendant filed pre-trial motions for funds to hire an expert to examine fingerprint and ballistics evidence, and for funds to hire an investigator. These motions were denied. The defendant concedes that the general rule is that the grant or denial of a motion for assistance of expert witnesses and other investigative services lies within the sound discretion of the trial court (see, e.g., *High v. State,* 247 Ga. 289 (2) (276 SE2d 5) (1981)), but contends that in this case, the trial court refused to exercise its discretion.

During the hearing on the motions, the court stated, in essence, that it was not going to grant the defendant's motions unless the defendant could provide the court with a case holding that such motions must be granted. The defendant was, of course, unable to do so.

We are not persuaded that the court's comments should be interpreted as a refusal to exercise discretion. The defendant cited to the court a number of cases holding that the grant of such assistance was within the discretion of the court. The state offered no suggestion to the contrary. In view of this and also considering that the

defendant failed to demonstrate any need for state-provided expert or investigative assistance, we are of the opinion that the trial court was merely stating its intention to exercise its discretion against the defendant unless the defendant presented the court with a case holding that the court could not so exercise its discretion. Thus, we find no error in the court's ruling.

5. The defendant complains that the trial court overly restricted his voir dire and erroneously denied three of his challenges for cause.

(a) The trial court did not err in refusing to allow the defendant to ask prospective jurors about their prior jury service, *Frazier v. State,* 138 Ga. App. 640 (2b) (227 SE2d 284) (1976); to ask prospective jurors if they would be more likely to believe law enforcement officers, or less likely to believe a defendant, than other witnesses, *Bennett v. State,* 153 Ga. App. 21 (3) (264 SE2d 516) (1980); to ask prospective jurors their understanding of matters of law (such as the presumption of innocence, death penalty procedure, or the necessity for unanimity of verdicts), *Lundy v. State,* 130 Ga. App. 171 (2) (202 SE2d 536) (1973); or to ask prospective jurors questions which might require them to prejudge the case, *Waters v. State,* 248 Ga. 355 (3) (283 SE2d 238) (1981).

Control of voir dire is vested in the sound legal discretion of the trial court. Ibid. No abuse of discretion has been demonstrated in this case.

(b) The trial court did not err in refusing to grant the defendant's challenges for cause where none of the challenged prospective jurors had seen the crime committed, had heard testimony under oath, or had an opinion "so fixed and definite that it would not be changed by the evidence or charge of the court upon the trial of the case." *Tennon v. State,* 235 Ga. 594, 595-596 (220 SE2d 914) (1975). See, also, *Waters v. State,* supra; *Jordan v. State,* 247 Ga. 328 (6) (276 SE2d 224) (1981).

6. Regarding the defendant's motion for change of venue:

(a) The defendant contends that the court erred by failing "to allow the defense to subpoena out-of-state documents and witnesses necessary to validate [the defendant's] need for change of venue." This contention is not supported by argument or citation of authority and must be deemed abandoned. Supreme Court Rule 45.

(b) The defendant contends that the trial court erred by denying his motion for change of venue. We find no error. Of the 89 prospective jurors who underwent voir dire, 17 were excused for bias and prejudice. Three others were excused because they had participated in the establishment of or had contributed to a reward fund with respect to this case. These 20 jurors constituted only 22%

of the entire panel. This percentage corroborates the absence of such prejudicial publicity as would require the grant of a motion for change of venue.[8] *Messer v. State,* 247 Ga. 316 (4) (276 SE2d 15) (1981). Nor has the defendant otherwise demonstrated that the setting of the trial was inherently prejudicial. See *Kesler v. State,* 249 Ga. 462 (7) (291 SE2d 497) (1982).

7. The defendant alleges error in the excusal for cause of prospective jurors opposed to the death penalty.

He first contends that a trial court may not under any circumstances constitutionally excuse prospective jurors who are opposed to the death penalty. This contention is meritless. See, e.g., Witherspoon v. Illinois, 391 U. S. 510 (88 SC 1770, 20 LE2d 776) (1968); Smith v. Balkcom, 660 F2d 573 (5th Cir. 1981).

Alternatively, the defendant contends that two jurors were improperly excused under Witherspoon because they did not make it "unmistakably clear" that they "would automatically vote against" the death penalty. *Allen v. State,* 248 Ga. 676 (286 SE2d 3) (1982). These two prospective jurors were Mrs. Prather and Mrs. Mouchet.

(a) The voir dire of Mrs. Prather transpired as follows:

BY THE COURT:

"Q. Are you conscientiously opposed to capital punishment?

"A. Yes.

"Q. You are opposed?

"A. I am opposed to it.

BY MR. CRAWFORD, FOR THE STATE:

"Q. In view of your last answer would your attitude toward capital punishment cause you to automatically vote against imposing the death penalty with regard to any evidence that might develop in the case?

"A. I'd have to say that I'd still have to say I'm still opposed to it.

"Q. Would you vote against it no matter what the evidence showed?

"A. Yes.

BY MR. HARVEY, FOR THE DEFENDANT:

"Q. Mrs. Prather are your reservations about capital punishment so strong if the judge charged you the law that you would only have to consider a sentence of death, you never had to impose it would you be able to consider a sentence of capital punishment?

"A. I don't know that I could.

---

[8] Many of these jurors were excused when it appeared that they had an opinion as to the defendant's guilt without further inquiry to determine if that opinion was fixed. *Tennon v. State,* supra.

"Q. I know it's a tough question.

"A. See because that's just my general opinion.

"Q. Are there some set of circumstances or facts where you would be able to consider imposing a sentence of death?

"A. I don't know of any.

"Q. You don't know of any at all?

"A. Not right now. When you're talking about my family or something I wouldn't know until I was in a position.

"Q. Do you feel that if someone in your family, immediate family were the victim of a violent crime, that you would be able to consider imposing a sentence of death?

"A. I wouldn't know unless I was in that position. Right now I would feel no, I don't know until the circumstances would arise.

"MR. HARVEY: That's all we have.

"MR. CRAWFORD: We challenge for cause.

"MR. HARVEY: She is qualified based upon her answer that she doesn't know whether she would be able to consider — I think given the circumstances that she might be able to consider it and we object to the challenge."

The court excused Mrs. Prather over the defendant's objection. We find no error. Mrs. Prather clearly stated that she would vote against the death penalty no matter what the trial might reveal. The defendant thereafter attempted to rehabilitate her by ascertaining whether or not under some circumstances the juror could "consider" the death penalty, not "impose" it. "It is not sufficient that the juror be willing to 'consider' the death penalty if he or she is committed to automatically vote against the death penalty after having 'considered' it." *Cofield v. State,* 247 Ga. 98, 103 (2) (274 SE2d 530) (1981).

(b) The voir dire of Mrs. Mouchet transpired as follows:

BY THE COURT:

"Q. Have some questions for you, the first question have you for any reason formed and expressed any opinion in regard to the guilt or innocence of the accused?

"A. Well for one side you mean?

"Q. Uh-huh.

"A. Elizabeth and I were real close.

"Q. The Court [sic?] that isn't the question. Listen to it carefully have you for any reason formed and expressed any opinion in regard to the guilt or innocence of the accused who is Mr. Castell over there?

"A. No.

"Q. Have you told anybody you think he's guilty, or have you told anybody you think he is not guilty?

"A. I haven't kept up with it.

"Q. Second question have you any prejudice or bias resting on your mind either for or against the prisoner at the bar?

"A. [Nodded negatively.]

"Q. Is your mind perfectly impartial between the state and the accused?

"A. To tell you the truth I don't know much about it.

"Q. The last question.

"A. The right to be done.

"Q. The last question, are you conscientiously opposed to capital punishment, the death penalty? Are you opposed to it?

"A. Yes, I don't much like that.

"THE COURT: Does the State have any questions?

BY MR. CRAWFORD:

"Q. Yes, ma'am. Mrs. Mouchet based on your last answer would you, could you yourself vote to impose the death penalty on somebody?

"A. I don't think so.

"Q. You couldn't do it no matter what the circumstances revealed?

"A. I just wouldn't want that on my conscience.

"Q. So I'm sure I understand you would you vote against the death penalty no matter what the evidence showed?

"A. I would think so.

"MR. CRAWFORD: State moves to strike for cause.

"MR. HARVEY: I would like to ask Mrs. Mouchet one question. Are your reservations about capital punishment so strong that you would even refuse to consider not to impose but to consider its imposition in a case regardless of the evidence and the instructions to you by the court?

"JUROR: [Nodded affirmatively.] You mean repeat.

"Q. Are your reservations about capital punishment so strong that you would not even be able to consider the imposition of the death penalty regardless of the evidence presented and instructions by the Court?

"A. Yes.

"Q. You wouldn't be able to even consider it?

"A. I don't think so.

"THE COURT: Thank you Mrs. Mouchet you are excused."

The state notes that Mrs. Mouchet was "real close" to the victim, and suggests the defendant failed to object to Mrs. Mouchet's dismissal because he, too, wanted her off the panel. The state contends that the defendant's failure to object amounts to a procedural default precluding appellate determination of the

Witherspoon issue on its merits. See, e.g., *Rivers v. State,* 250 Ga. 303 (7) (298 SE2d 1) (1982); *Gober v. State,* 247 Ga. 652 (2) (278 SE2d 386) (1981); *Jacobs v. Hopper,* 238 Ga. 461, 464 (233 SE2d 169) (1979) (Jordan, J., concurring specially).

"[I]t is . . . the rule in Georgia, as elsewhere, that objections to irregularities must ordinarily be made at a time when they may be remedied, or they are waived. See *Morris v. State,* 200 Ga. 471 (1) (37 SE2d 345) (1946)." *State v. Williamson,* 247 Ga. 685, 686 (279 SE2d 203) (1981). Nonetheless, we have been less stringent in our enforcement of a strict contemporaneous objection rule as to error that may affect a sentence of death because we must, under OCGA § 17-10-35 (c) (1) (Code Ann. § 27-2537), determine whether the sentence was imposed as a result of passion, prejudice, or other arbitrary factor. *Gilreath v. State,* 247 Ga. 814 (15) (279 SE2d 650) (1981). For example, we have held that although "it is [normally] the obligation of the party who asserts error to show it affirmatively by the record [cit.] . . . failure to record the Witherspoon voir dire in a case in which the sentence of death is imposed, is reversible error." *Owens v. State,* 233 Ga. 869, 871, 873 (214 SE2d 173) (1975). And in *Davis v. State,* 236 Ga. 804 (1) (225 SE2d 241) (1976), we considered an alleged Witherspoon error on its merits despite the lack of a proper objection.[9] Thus, in this case, we must consider the defendant's belated objection to the dismissal of Mrs. Mouchet on its merits.

We conclude that the trial court did not err by dismissing Mrs. Mouchet. Use of phrases such as "I think so" or "I don't think so" do not, when considered in the context of the entire voir dire of the juror, necessarily indicate an equivocation with regard to an unwillingness to impose a death penalty. The answers of Mrs. Mouchet, considered together, unambiguously reveal an intent to vote against the death penalty no matter what the evidence showed, and she was properly excused. *Krier v. State,* 249 Ga. 80 (287 SE2d 531) (1982).

8. The defendant contends that the trial court erred by overruling his three motions for mistrial.

(a) The first motion was made near the onset of the state's examination of Jones:

"Q. [By the state] At that time [the week before the trial] . . . I instructed you, there was no deals of any kind?

"A. Yes, sir."

---

[9] Our finding that the Witherspoon error was harmless was reversed in Davis v. Georgia, 429 U. S. 122 (97 SC 399, 50 LE2d 339) (1976).

"Q. And you are fully aware you are also charged with murder?

"A. Yes, sir.

"Q. I ask you whether or not that I personally instructed you also that under the laws of Georgia, under conspiracy, and under parties [to] a crime regardless of your participation, you was as guilty as the rest of them?

"A. Yes, sir."

The defendant objected to the last question and moved for a mistrial, on the ground that the district attorney had stated a personal belief in the defendant's guilt. The state contends that, since the allegedly improper comment was a question and not a comment, it was not objectionable.

OCGA § 17-8-75 (Code Ann. § 81-1009) states: "Where counsel in the hearing of the jury make statements of prejudicial matters which are not in evidence, it is the duty of the court to interpose and prevent the same. On objection made, the court shall also rebuke the counsel and by all needful and proper instructions to the jury endeavor to remove the improper impression from their minds; or, in his discretion, he may order a mistrial if the prosecuting attorney is the offender." "This Code section has been applied not only in situations where counsel have made improper statements or prejudicial remarks in the presence of the jury during a trial, but it also has been applied where [the] same is made 'in the form of a question.' [Cits.]" *Hamilton v. State,* 155 Ga. App. 799, 800 (2) (272 SE2d 763) (1980). Thus, we cannot agree with the state that the comment was not objectionable simply because it came in the form of a question.

It has long been the rule that a district attorney may not state to the jury his personal belief in the defendant's guilt. See, e.g., *Wells v. State,* 194 Ga. 70 (5) (20 SE2d 580) (1942). The question to which the defendant objected did imply a belief in the defendant's guilt and the trial court erred by overruling the defendant's objection and by failing to take the corrective action contemplated by OCGA § 17-8-75 (Code Ann. § 81-1009). Nevertheless, we find no blatant misconduct in this case; the state's question did not mention the defendant by name, and it is apparent that the state was trying, not to state a belief that the defendant was guilty, but to establish that Jones was aware of the charges against him and of the seriousness of those charges, that no deals had been made for his testimony, and that he was nonetheless willing to testify. Because we find that it is highly probable that this error did not contribute to the verdict, we find no reversible error. *Johnson v. State,* 238 Ga. 59 (230 SE2d 869) (1976); *Bentley v. State,* 131 Ga. App. 425 (205 SE2d 904) (1974). For the

same reasons, we find that the trial court did not err in refusing to grant a mistrial.

(b) The second motion for mistrial came at the end of the defendant's cross-examination of Jones. After securing Jones' admission that his first statement was a lie and that not all of his second statement was true, the defendant's attorney sought, by use of suggestive questions, to secure Jones' admission that he was still lying; that Castell had not been with Jones on the morning of the murder and that Jones, not the defendant, had walked into the house and shot Mrs. Williams. Jones responded to these questions with vigorous denials. When the defendant's attorney finished, the district attorney stated, "Your Honor, if Mr. Harvey does not offer witnesses to substantiate everything that he has been telling this man that he did, he is totally wrong in the examination of this man." The defendant moved for a mistrial on the ground that the district attorney's objection was an improper comment on his right not to testify.

We cannot agree with the district attorney's suggestion that the questioning by the defendant's attorney violated DR 7-106 (C). A party has the right to a thorough and sifting cross-examination of the witnesses called against him and, usually, to conduct that examination by use of leading questions. OCGA §§ 24-9-63, 24-9-64 (Code Ann. §§ 38-1706, 38-1705). Leading questions are suggestive. *Ealey v. State,* 139 Ga. App. 110 (227 SE2d 902) (1976). In view of the evidence connecting Jones with the crime and his prior inconsistent statements, the defendant properly inquired into Jones' veracity and the extent of his actual participation. We do not believe, however, that the state's objection, if such it was, amounted to improper comment on the defendant's right not to testify, see *Bryant v. State,* 146 Ga. App. 43 (1) (245 SE2d 333) (1978), or that the trial court erred by denying the defendant's motion for mistrial.

(c) The third motion for mistrial occurred during the state's cross-examination of the defendant, when the district attorney asked, "Then I ask you whether or not when you went in and she screamed, was she on her knees or was she standing up?" The defendant objected and moved for a mistrial. For reasons stated above, the question was proper, and the trial court did not err by refusing to grant a mistrial.[10]

9. After the defendant rested, he was allowed to re-open the

---

[10] From some of the photographs, showing blood on the victim's lap but not on her chest, it could be inferred that she was on her knees when she was shot. And, there was certainly evidence that Castell had shot her.

evidence so that he could testify in his own behalf. He again rested. The next day, the defendant sought to re-open a second time so that he could present the testimony of Donald Addison, who previously had indicated that he would not be willing to testify. The defendant's attorney told the court that only after he had rested a second time did he learn that Addison had changed his mind and would now testify. The state objected, contending that all of the state's witnesses, some of whom could have rebutted portions of Addison's testimony, had been dismissed and it would take days to get them back.

The court refused to allow the defendant to re-open a second time. The defendant contends that this refusal was error. We cannot agree. It is well established that the matter of re-opening the evidence is within the sound discretion of the trial court. *State v. Roberts,* 247 Ga. 456, 457 (277 SE2d 644) (1981). A trial must come to an end at some point, and we find no abuse of discretion in this case.[11]

10. We address the defendant's contention that the trial court's charge was deficient in several particulars:

(a) The court's charge on malice was not error. *Franklin v. State,* 245 Ga. 141 (9) (263 SE2d 666) (1980).

(b) The trial court did not err by charging: "In your consideration of the alleged conspiracy, you should first determine from all the testimony and evidence in the case whether or not a conspiracy existed . . ." The rule discussed in Division 1(a) of this opinion is a rule of admissibility. The trial court properly admitted the declarations of the co-conspirator, and the jury was entitled to consider all of the evidence in its consideration of the existence of the conspiracy.

The trial court properly refused to give the defendant's request to charge that, in determining whether a conspiracy existed, the jury could not consider the declarations of the alleged accomplice.

(c) The court did not err by charging that an accessory after the fact is not an accomplice. *Moore v. State,* 240 Ga. 210 (1) (240 SE2d 68) (1977).

(d) The defendant contends that the trial court's charge on corroboration was essentially the same as that given in *Milton v.*

---

[11] Addison did not subsequently testify at the sentencing phase. The defendant originally contended on appeal that the failure to call Addison then amounted to ineffective assistance of counsel. However, by letter to this court dated February 7, 1983, counsel for the defendant abandoned this contention; after refreshing his memory by conferring with co-counsel, he remembered that Addison was not called at the sentencing phase because, "after the trial court refused to allow Mr. Addison's testimony at the guilt/innocence phase, Mr. Addison once again advised the defense that he would refuse to testify."

*State,* 248 Ga. 192 (282 SE2d 90) (1980), and constitutes reversible error.

In *Milton,* the trial court had correctly submitted to the jury the question of the status of the alleged accomplice. Evidence existed which would have supported a finding that the alleged accomplice acted under duress or coercion and was therefore not an accomplice (even though she may have been guilty of murder, because coercion is no defense to murder). The court, however, erroneously gave a charge to the jury which would have allowed the jury to find that the testimony of the alleged accomplice had been corroborated, when there was no evidence in the case from which the jury could have found such corroboration. Although, under one theory (the witness was not an accomplice) a conviction would have been proper, under another theory, erroneously presented to the jury (the witness was an accomplice, but her testimony was corroborated), the conviction would have been improper.

In this case, there *was* evidence from which the jury could have found corroboration, and the court's charge on accomplices and the requirement of corroboration was not erroneous.

(e) Finally, the trial court did not err by refusing to give the defendant's requests to charge concerning the testimony of an informer who provides evidence for personal advantage, or the testimony of any person induced by promises of immunity from further punishment. There was no evidence to support either charge. *Treadwell v. State,* 129 Ga. App. 573 (3) (200 SE2d 323) (1973).

11. The defendant alleges error in the trial court's insistence on oral testimony at the defendant's motion for new trial and the court's refusal to consider the defendant's affidavits.

It has been held that on motion for new trial, the court has the discretion to hear affidavits or oral testimony. *Herrin v. State,* 71 Ga. App. 384 (1) (31 SE2d 124) (1944). See also, *Chattanooga &c. R. Co. v. Morrison,* 140 Ga. 769, 773-774 (3) (79 SE 903) (1913). This discretion, however, "should be justly used so as not to entrap or work a hardship upon either party. Justice is the object to be obtained, and it should be reached by just means." Ibid.

In this case it is not clear to us that the trial court was aware that it could properly have considered the defendant's affidavits. Nor is it clear to us that the defendant was not entrapped by the court's refusal to consider the affidavits. Rather than remanding the case at this point, however, we will affirm the trial court's denial of the defendant's motion for new trial, but *without prejudice* to the defendant's right to pursue his motion for new trial based on those allegations made in his original motion for new trial which required supplementation of the trial record.

12. On the record before us, we are unable to conclude that the defendant failed to receive reasonably effective assistance of counsel. *Pitts v. Glass,* 231 Ga. 638 (203 SE2d 515) (1974).

### Sentence Review

13. The record before us does not support the defendant's contention that the Georgia death penalty statute is being administered arbitrarily or discriminatorily. Compare, Smith v. Balkcom, 660 F2d 573 (5th Cir. 1981).

14. The defendant contends that the trial court's charge on mitigating circumstances was error, citing Spivey v. Zant, 661 F2d 464 (5th Cir. 1981). We find no error.

The jury was instructed to consider mitigating circumstances, and the court's charge made it clear to the jury that it could recommend a life sentence even if it found that the state had proven the existence of one or more aggravating circumstances beyond a reasonable doubt. The instructions given sufficiently defined mitigating circumstances and informed the jury as to the function of mitigating circumstances to comply with Spivey v. Zant, supra. *Horton v. State,* 249 Ga. 871 (8) (295 SE2d 281) (1982).

15. The defendant contends that the trial court erred by refusing to give his requests to charge during the sentencing phase of the trial.

The following statutory aggravating circumstances were presented to the jury: (1) the defendant "committed the offense of murder for another, to-wit: Donald Addison and Raymond Mc-Junkin, for the purpose of receiving money and other thing of monetary value" (OCGA § 17-10-30 (b) (4) (Code Ann. § 27-2534.1)); and (2) the defendant "committed murder as an agent and employee of Donald Addison and Raymond McJunkin" (OCGA § 17-10-30 (b) (6) (Code Ann. § 27-2534.1)).

The trial court did not err by refusing to give the defendant's requested charge pertaining to the § (b) (4) aggravating circumstance. "The failure to give requested instructions in the exact language requested, where the charge given substantially covers the same principles, is not grounds for reversal." *Kelly v. State,* 241 Ga. 190 (4) (243 SE2d 857) (1978).

Nor did the trial court err by refusing to give the defendant's charge pertaining to the § (b) (6) aggravating circumstance. The defendant contends that the terms "agent" and "employee" in § (b) (6) should be given the same meanings as they are given in the context of agency or tort law. For example, the defendant contends that a person would not be an "employee" under § (b) (6) unless his "employer" had the right to control the performance of the employee

and to direct the manner in which the work shall be done.

The terms "agent" and "employee" are words of art in other contexts, with meanings pertinent to and shaped by those contexts. We do not think that these meanings should be transposed to our death penalty statute. This conclusion is bolstered by our examination of § (b) (6) in its entirety, which states: "The offender caused or directed another to commit murder or committed murder as an agent or employee of another person." It is clear that the legislature intended that § (b) (6) be applicable to murders for hire and that it be applicable to both the hirer and the one hired. One would expect, therefore, a reciprocity of liability with respect to the two halves of § (b) (6); i.e., one should be an "agent" or "employee" of another if one were "caused or directed" to commit murder by the other. This would not necessarily be the case if the terms "agent" and "employee" were given the meanings offered by the defendant.

We hold that the terms "agent" and "employee," as used in OCGA § 17-10-30 (b) (6) (Code Ann. § 27-2534.1), should be given their common, everyday meanings: An employee is one who is hired by another and an agent is one who acts for another. The defendant's request to charge was an inaccurate statement of the law, and the trial court properly refused to give it.

The defendant makes no argument with respect to his other requests to charge. We have nonetheless examined them and find that they are either inappropriate or essentially covered by the court's charge.

16. We are not required by Enmund v. Florida, —— U. S. —— (102 SC 3368, 73 LE2d 1140) (1982), to declare unconstitutional any aggravating circumstance which, on its face, might allow a jury to impose a death sentence on someone who had no intent to kill. The defendant's contention to the contrary is meritless.

17. Aggravating circumstances, such as § (b) (4) and § (b) (6), are not invalid because they might overlap to some extent. Nor is § (b) (6) unconstitutionally vague.

18. The jury found both of the statutory aggravating circumstances presented to it beyond a reasonable doubt. OCGA § 17-10-30 (c) (Code Ann. § 27-2534.1). The evidence supports its findings. Jackson v. Virginia, supra; OCGA § 17-10-35 (c) (2) (Code Ann. § 27-2537).

19. We find that the sentence of death was not imposed under the influence of passion, prejudice or other arbitrary factor. OCGA § 17-10-35 (c) (1) (Code Ann. § 27-2537).

20. We find that the sentence of death imposed in this case is not excessive or disproportionate to sentences imposed in similar cases,

considering both the crime and the defendant. OCGA § 17-10-35 (c) (3) (Code Ann. § 27-2537). Although defendants who were hired to commit murder have been given life sentences,[12] cases cited in the appendix show that juries find the death penalty to be appropriate punishment in contract murder cases.

Moreover, the jury in this case had before it evidence of the defendant's prior record. The defendant had a 1963 conviction for housebreaking and larceny, for which he was given a six-year sentence; a 1965 conviction for larceny, for which he was given an eight-year sentence; an additional 1965 conviction for housebreaking and larceny, for which he was given a nine-year sentence; a 1971 conviction for armed robbery, grand larceny and receiving stolen goods, for which he was given an 18-year sentence; an additional 1971 conviction for armed robbery, grand larceny and receiving stolen goods, for which he was also given an 18-year sentence; and a 1979 conviction for escape, for which he was given a 15-month sentence (these were all South Carolina convictions). The defendant had only been released from custody a few weeks before he murdered Mrs. Williams. Our cases show that a defendant's prior record is a factor taken into consideration by juries. The serious and extensive prior record of this defendant provides additional support for the imposition of the death penalty in this case.

The cases listed in the appendix support the death penalty in this case.

*Judgment affirmed. All the Justices concur.*

DECIDED MARCH 16, 1983 —
REHEARING DENIED APRIL 1, 1983.

*Becker & Harvey, Bruce S. Harvey,* for appellant.

*V. D. Stockton, District Attorney, Michael H. Crawford, Assistant District Attorney, Michael J. Bowers, Attorney General, Mary Beth Westmoreland, Assistant Attorney General,* for appellee.

APPENDIX.

*Horton v. State,* 249 Ga. 871 (295 SE2d 281) (1982); *Tucker v. State,* 245 Ga. 68 (263 SE2d 109) (1980); *Alderman v. State,* 241 Ga. 496 (246 SE2d 642) (1978); *Davis v. State,* 241 Ga. 376 (247 SE2d 45) (1978); *Douthit v. State,* 239 Ga. 81 (235 SE2d 493) (1977); *Stephens*

---

[12] *Reaves v. State,* 242 Ga. 542 (250 SE2d 376) (1978); *Florence v. State,* 243 Ga. 738 (256 SE2d 467) (1979); *Kesler v. State,* 249 Ga. 462 (291 SE2d 497) (1982); *Salmon v. State,* 249 Ga. 785 (294 SE2d 500) (1982) and *Mulkey v. State,* 250 Ga. 444 (298 SE2d 487) (1983).

*v. State,* 237 Ga. 259 (227 SE2d 261) (1976); *Spencer v. State,* 236 Ga. 697 (224 SE2d 910) (1976); *Smith v. State,* 236 Ga. 12 (222 SE2d 308) (1976) (two cases).