## 42863. POPE v. THE STATE.
### (345 SE2d 831)

GREGORY, Justice.

This is a death penalty case. Appellant, John David Pope, was indicted in Haralson County for murder, armed robbery, kidnapping with bodily injury, kidnapping, and two counts of aggravated assault. A change of venue was granted and the case was tried before a jury in Cobb County. Pope was convicted on all counts and sentenced to death on the murder count.[1]

---

[1] The jury returned its sentencing verdict on August 25, 1985. A motion for new trial was filed on September 12, 1985, amended on the date of the hearing on the motion, October 15, 1985. The motion for new trial was denied on October 18, 1985. The case was docketed in this court on October 30, 1985, and the case was orally argued on February 10, 1986.

*Facts*

Just before closing time in the evening of February 27, 1984, Pope entered a Reed Drugstore in Bremen, Georgia, armed with a pistol that his sister had purchased for him. The only other people in the drugstore at the time were 17-year-old Lisa Kirk and the pharmacist, Lee Webb. Drawing his pistol, Pope demanded and received cash from the front register and the register in the pharmacy area, and a quantity of drugs (Demerol, according to Pope). At Webb's suggestion, the store lights were turned off (since it was by now past closing time), and Pope put Webb and Kirk into a bathroom located in the stockroom in the rear of the store.

Webb and Kirk waited a few minutes and then Webb, thinking the robber had left, re-entered the store area. Kirk waited in the bathroom. She testified that "almost immediately . . . I heard a struggle . . . and I wanted to go out and help." She picked up a "metal . . . roll-o-matic mop" and entered the store. Seeing Webb and the defendant engaged in a struggle for a gun, she began hitting the latter with the mop. She testified she hit him 10 to 20 times without appreciable effect. Webb lost his balance and fell, and was shot as he rose. Pope then turned and shot Kirk and left.

Webb died from a gunshot wound which passed through his jaw and into his neck. Kirk was shot in the neck, but survived.

Pope ran to a nearby convenience store, pulled out his pistol, and ordered the two occupants to lie on the floor. As they did so a customer drove up, and Pope went outside and forced the man to drive him to Marietta. Pope eventually was arrested in a stolen pickup truck in Phoenix, Arizona. A pistol found in the pickup was identified by ballistics examination as the murder weapon.

The evidence supports the conviction. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

*Enumerations of Error*

1. Enumerations 1 through 4 and 37 question the selection of grand and traverse jurors in Haralson and Cobb counties.

(a) Pope's contention that blacks and women have been discriminated against in the selection of grand jury forepersons in Haralson County is answered by *Ingram v. State*, 253 Ga. 622 (1c) (323 SE2d 801) (1984).

(b) Pope's contention that blacks are unconstitutionally underrepresented on the Cobb County traverse jury list is answered by *Cook v. State*, 255 Ga. 565 (11) (340 SE2d 843) (1986), wherein we found the underrepresentation of blacks on the Cobb County jury lists, involving the same percentages shown here, to be constitution-

ally insignificant whether analyzed absolutely or comparatively.

As to the remaining groups allegedly underrepresented on the Haralson County grand jury list and on the Cobb County traverse jury list — young persons, single persons, persons having recently moved into the respective counties, the marginally educated, and the unemployed — we find that Pope has failed to establish as a matter of fact that in either county any of these groups are cognizable for purposes of jury selection. See *Parks v. State*, 254 Ga. 403 (6b) (330 SE2d 686) (1985).[2]

(c) Relying upon OCGA § 15-12-62, Pope contends the Cobb County traverse jury venire was improperly drawn and that his challenge to the array was erroneously overruled. Inasmuch as OCGA § 15-12-62 clearly applies to the selection of *grand* jurors, we find defendant's contention to be without merit. Nor do we find any violation of OCGA § 15-12-42, which applies to the selection of trial jurors.

Nor can we agree with Pope's further contention that this case must be reversed because at the time the venire was drawn there were only four jury commissioners in Cobb County. Although OCGA § 15-12-20 prescribes six-member boards of jury commissioners, it also provides that the court can by rule establish a board having less than six members. Pope contends that because no rule was promulgated, the board in Cobb County should have had six members. We note that Pope has not shown that there were fewer than six members on the board when the jury list was last revised (and the board is not involved in the drawing of individual venires from the list) but, in any event, we "do not find here such disregard of the essential and substantial provisions of the statute as would vitiate the arrays." *Franklin v. State*, 245 Ga. 141, 147 (1) (263 SE2d 666) (1980).

(d) Drawing the venire was not a "critical stage" of the proceedings requiring Pope's presence.

2. Contrary to Pope's 5th enumeration, the trial court did not err by denying defendant's motion to sever the offenses. *Gober v. State,*

---

[2] In any event, the underrepresentation of these groups would not invoke the "high standard of judicial review" necessitated by the underrepresentation of a "highly protected class," (for example, blacks or women). *Parks v. State*, supra, quoting *Payne v. State*, 233 Ga. 294 at 308-309 (210 SE2d 775) (1974). A jury list revised every two years will most likely underrepresent to some extent young persons and persons recently having moved into the community. Regarding unemployed persons, we note that the expert on whom Pope relies testified that "unemployed people, by their very nature . . . are very difficult to contact. That doesn't mean they're trying to hide, it's simply that they're extremely mobile, they're not very likely to have telephones. They're just very difficult people to contact."

As the United States Supreme Court has stated, "some play in the joints of the jury-selection process is necessary . . . [and a government may] reasonably adopt procedures which, while designed to assure that 'an impartial jury (is) drawn from a cross-section of the community,' [cit.], at the same time take into account practical problems in judicial administration." *Hamling v. United States*, 418 U. S. 87, 138 (94 SC 2887, 41 LE2d 590) (1974).

247 Ga. 652 (1) (278 SE2d 386) (1981).

3. Prior to trial, Pope was held in the Douglas County Jail. On January 14, 1985, Pope was in an area known as "Cell Block 2 Max." At about 5:00 p.m. that day, the chief jailer noticed contraband[3] in the cell next to the one Pope was in, and also that something appeared to be wrong with the ceiling grate. Pope had made prior escape attempts and the jailer had information that he and another inmate were planning to try again. The jailer ordered a search of the cell block. Everything was removed from the cell block and searched. The prisoners were given new mattresses and linen for the night and the next day those items which the prisoners were entitled to have in their cells were returned to them.

The search turned up a sawblade, a flashlight, and some "buck" (homemade alcohol), none of which was introduced in evidence at trial.

Pope testified, "I got back all of the motions that I had and all the letters that [my attorneys] had sent me. But I did not receive — get the Unified Appeal Act [sic] back that the Court had issued me. I did not get my personal things that I wrote down [at the request of my attorneys]." When asked on cross-examination whether everything he had lost could be reproduced, Pope answered, "I guess so."

The chief jailer testified that the Douglas County Jail holds prisoners for other counties and for the U. S. Marshal Service. When he learned that some of Pope's effects were missing after the search, he made efforts to locate them, but, he testified, "You have to realize we are about like a train station and we have usually 50 persons moving in our book-ins a day . . . We have a tremendous [number] of inmates in and out, and a tremendous amount of property we handle . . . There has been an occasion when there's been property lost . . . ."

In his 6th enumeration, Pope argues that the personnel at the Douglas County Jail attempted to prejudice his right to a fair trial and that their misconduct violated various of his constitutional rights.

We do not agree that the search was improper. Jail personnel are entitled to maintain jail security, and to take reasonable steps to prevent prisoners from escaping.

The loss of some of Pope's notes was unfortunate, but the record simply does not support Pope's contention that the loss was intentional, and, moreover, it is clear from Pope's own testimony that he was not prejudiced by the loss.

Finally, the record does not support the accusation that the Douglas County sheriff and the jail personnel were fabricating stories

---

[3] "Contraband" here refers to anything the prisoner is not supposed to have in his cell.

about Pope's escape attempts.

4. In his 7th, 8th and 9th enumerations of error, Pope argues that the court erred by changing venue to Cobb County, and that the case was tried in a "circus" atmosphere.

Venue was changed from Haralson County at Pope's request, after it became obvious during an attempted voir dire proceeding that prospective jurors in Haralson County had been exposed to extensive pre-trial publicity. It is clear from the subsequent voir dire proceedings in Cobb County that prospective jurors there had not been exposed to prejudicial levels of pre-trial publicity. See *Kesler v. State*, 249 Ga. 462, 471-72 (291 SE2d 497) (1982). The court did not err by finding that Pope could get a fair trial in Cobb County. *Devier v. State*, 253 Ga. 604 (4) (323 SE2d 150) (1984).

We find no merit to Pope's accusation that "the bailiffs rendered the courtroom atmosphere a circus, by frisking defense counsel for weapons, [and] the Court took no action." What the record shows is that immediately before voir dire began in Haralson County, defense attorney Clive Stafford-Smith orally supplemented the motion for change of venue by pointing out that OCGA § 17-7-150 (b) requires a change of venue where there is a "probability or danger of violence." He stated: "Now they've got this gun thing out here to check for weapons. And upon my request, they told me that was because there was a threat to the defendant . . . [W]e're adding this to our request for change of venue."

It is not at all clear from the foregoing that defense counsel were frisked, but, in any event, the court did take action, since venue, ultimately, was changed and the case was not tried in Haralson County. Moreover, the actions of the bailiffs during the ultimately aborted voir dire proceedings in Haralson County plainly had no effect on the atmosphere of the trial, which was held in Cobb County.

Pope makes other factual allegations that equally lack record support. We find no merit to any of them.

5. On March 19, 1985, some three weeks after the crime, after Pope had been identified as a suspect, but before he had been apprehended, Lisa Kirk was interviewed by Jim Axel, newsman for WAGA TV, an Atlanta television station. Axel had been provided with a photograph of Pope, probably by some law enforcement agency, although Axel testified that he did not remember which one. Near the end of the interview, as an afterthought, Axel showed the photograph to Kirk and asked if that was the man who shot her. She answered that it was, without doubt, the man who had shot her.

In his 10th enumeration, Pope argues that Kirk's in-court identification should have been suppressed because it had been tainted by a suggestive identification procedure. We do not agree. Kirk testified in detail about the circumstances of the crime and the opportunities she

had to observe the defendant as she waited on him while he made some minor purchases, after he pulled out his gun and herded the two victims around the store, while he and Webb were struggling, and just before he shot Kirk. Based upon these observations of the defendant, Kirk gave police an accurate description of the defendant and helped develop a composite sketch. In these circumstances, Kirk's testimony was reliable even though Axel's confrontation procedure was suggestive. The trial court did not err by allowing her to testify. *Rivers v. State*, 250 Ga. 303 (4) (298 SE2d 1) (1982).

6. When Pope was arrested in Phoenix, police seized the stolen pickup in which he had been riding. The vehicle was searched and then impounded until its owner could come for it. Craig Thero, the owner's nephew, picked it up and drove it to Amarillo, Texas. He testified that as he was driving, he was bothered by something in the seat in the vicinity of his left leg. He thought at first that maybe the seat springs were weak and that somebody had "put a board in there or something." Eventually, he decided "this is ridiculous," and reached his hand through an open seam into the upholstery "to see what was so hard under there." "[D]own between the folds of the seat in that cotton padding," he found a gun. He turned it over to the police in Amarillo as soon as he arrived.

Amarillo police officer Jerry Conley testified that when he received the gun, he ran the serial number on the "NCIC" system to see if it was wanted. It was, and Conley mailed it to Scott Roberts of the GBI. Roberts testified that he received it and turned it over to Kelly Fite of the state crime lab for a ballistics examination, which showed it to be the homicide weapon in this case.

In his 11th enumeration, Pope argues that the gun should have been excluded from evidence because no proper chain of custody was shown. We find no error. A chain of custody was shown to a "reasonable certainty." The remote possibility that some intermeddler having nothing to do with the case planted the gun in the pickup after Pope was arrested does not require the suppression of the evidence.[4] *Anderson v. State*, 247 Ga. 397, 399 (276 SE2d 603) (1981); *Speight v. State*, 159 Ga. App. 5 (4) (282 SE2d 651) (1981).

7. Enumerations 12 through 17 relate to the voir dire and the selection of the jury.

(a) Use of death qualified jurors in the guilt-innocence phase of a death penalty case is not unconstitutional. *Lockhart v. McCree*, ___ U. S. ___ (106 SC 1758, ___ LE2d ___) (1986).

(b) The court did not "drastically" limit defense voir dire, and we

---

[4] We point out, in connection with this enumeration of error as well as the previous one, that Pope admitted committing an armed robbery of the Reed drugstore, and, in fact, identified the homicide weapon as his own. His defense was lack of intent to kill.

find no abuse of discretion in the court's control of the voir dire. *Curry v. State*, 255 Ga. 215 (2b) (336 SE2d 762) (1985). Although we agree with Pope that some of the state's questions were objectionable, Pope did not object to them, and cannot complain that the state's objections to similar defense questions were sustained.[5] Cf. *Cargill v. State*, 255 Ga. 616 (17 (a)) (340 SE2d 891) (1986).

(c) The trial court did not err by excusing prospective juror Emerson. She testified that she did not believe in capital punishment and could vote to impose a death sentence only in a case involving the brutal murder of a member of her family. "[W]hether or not a venireman might vote for death under certain personal standards, the state still may properly challenge that venireman if . . . the juror's views [on capital punishment] would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' [Cit.]" *Wainwright v. Witt*, 469 U. S. ___ (105 SC 844, 83 LE2d 841) (1985). See also *Curry v. State*, supra, 255 Ga. at 219-221; *Alderman v. State*, 254 Ga. 206 (4) (327 SE2d 168) (1985).

(d) The court did not err by refusing to grant defense challenges to four allegedly biased prospective jurors.

Juror Smith testified that because of his work with the Better Business Bureau, he tended to be biased against those accused of a crime, and that in a majority of cases the defendant would "pretty well" have to prove his innocence. When asked whether he felt that way in this case, however, he answered, "I don't have any reason to feel either way in this case because I don't know anything about it." He testified that he had no bias or prejudice against the defendant in this case and that his mind was perfectly impartial between the state and the accused. Smith's voir dire testimony as a whole authorized a finding by the trial court that he was a qualified juror.

None of the other three jurors had the kind of fixed opinion about the case as would disqualify them. See *Waters v. State*, supra note 5, 248 Ga. at 362. Jurors are not disqualified because they might be "influenced" by the introduction of material evidence.

(e) Prospective juror Brownlow should have been excused for bias in favor of the death penalty. The death-qualification voir dire of this prospective juror is set forth in Appendix A to this case. Briefly summarized, Brownlow testified that if the defendant was "found guilty beyond a shadow of a doubt" and the trial court authorized him to consider the death penalty, he would impose it. He would listen to the evidence, but it would not change his opinion. "[R]egardless of anything the defendant might put up in the way of mitigation," he would

---

[5] Hypothetical questions and questions calling for prejudgments are improper. *Waters v. State*, 248 Ga. 355 (3) (283 SE2d 238) (1981).

vote for the death penalty. When asked whether his sentencing decision would be automatic, Brownlow answered, "Only if he's found guilty."

A criminal defendant is entitled to an impartial jury by the Sixth Amendment to the U. S. Constitution. A juror who has made up his mind prior to trial that he will not weigh evidence in mitigation is not impartial. This juror's views on capital punishment would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, supra.

The attorney general argues that although Brownlow did express a bias in favor of the death penalty, any error in failing to excuse him was harmless because Pope's jury was selected before Brownlow was reached. But Brownlow was the 42nd qualified juror. It takes a qualified panel of 42 to select a jury (20 defense strikes plus 10 state strikes plus 12 jurors). Even if the state uses all of its allotted strikes, a defendant simply cannot strike the 42nd juror. Either the jury will be selected before the 42nd juror is reached because the defendant saved a strike for that juror, or the 42nd juror will be seated after the defendant exhausts his strikes.

Any error regarding a prospective juror qualified 43rd or later on the panel is harmless, unless it becomes necessary to use an alternate juror. *Devier v. State*, supra, 253 Ga. 604 (3). But it follows from the principle announced in *Davis v. Georgia*, 429 U. S. 122 (97 SC 399, 50 LE2d 339) (1976), and applied by this court in *Blankenship v. State*, 247 Ga. 590 (277 SE2d 505) (1981), that death-qualification error affecting the panel of 42 from which the jury is selected is not harmless simply because the defendant fails to exhaust his peremptory strikes.

The error regarding juror Brownlow does not infect the conviction. On the question of guilt or innocence, he was not disqualified. The death sentence, however, must be set aside. *Blankenship v. State*, supra.

(f) Pope contends that his right to an impartial and representative jury was violated by the prosecutor's use of peremptory challenges to strike blacks and persons opposed to the death penalty but not excludable as a matter of law. We find no error. Resolution of this enumeration of error "properly turns on the application of equal protection principles." *Batson v. Kentucky*, ___ U. S. ___ (39 CrLR 3061, 3062 (fn. 4) (Case # 84-6263, decided April 30, 1986). Regardless of whether *Batson* will be applied retrospectively to cases such as this one, pending on direct appeal at the time of the decision, Pope cannot establish a prima facie case. To do so, he "must first show that he is a member of a cognizable racial group [cit.], and that the prosecutor has exercised peremptory challenges to remove from the venire members of the *defendant's race*." Id. at 3066. Pope is white, and the prosecutor's use of peremptory challenges to excuse two black persons

and four persons opposed to the death penalty did not violate Pope's right to equal protection of the law.

8. Pope argues that his constitutional rights were violated because "[t]he state was allowed to call on unlimited resources in the preparation of the prosecution case, without once having to make application to the trial court for funds." Although we doubt the state has "unlimited resources," it is true that the state is not indigent. How Pope's constitutional rights are violated thereby, we do not know. We find no merit to Pope's claim that he was denied equal protection of the law because he had to establish a need for assistance and the state did not.

Nor can we agree that Pope's rights as outlined in *Ake v. Oklahoma*, 470 U. S. ___ (105 SC 1087, 84 LE2d 53) (1985), were violated by the trial court's refusal to rule that the results of the court-provided CT scan would be confidential to the defendant.

We find no abuse of discretion in the court's rulings on Pope's various motions for expert assistance.

9. In his 19th enumeration, Pope argues the trial court erred by denying funds to secure the attendance of out-of-state lay witnesses in mitigation. He contends that he asked for funds to bring five out-of-state witnesses, including Charles Jennings (a friend who observed Pope commit an act of heroism), B. A. Buck (Pope's uncle), Curtis Pope (defendant's brother), William Howe (a friend of the family for over 30 years), and Reverend Ronald Walker (who would testify to the nature of an execution). The trial court, however, according to Pope, allowed funds only for Jennings and Buck. The denial of funds for the remaining three witnesses, Pope contends, denied him a fair trial.

Testimony regarding the nature of an electrocution is not admissible in mitigation. *Horton v. State*, 249 Ga. 871 (5) (295 SE2d 281) (1982); *Franklin v. State*, 245 Ga. 141 (7) (263 SE2d 666) (1980). Hence, the trial court did not err by denying funds for Reverend Walker. We need not determine whether the court would have erred by refusing funds for the other two witnesses. Although neither William Howe nor Curtis Pope testified in mitigation, the trial court did not deny funds for either witness.

At a hearing on March 4, 1985, the trial court granted Pope's motion as to witnesses William Howe and B. A. Buck. On April 15, the trial court granted defendant's motion as to Charles Jennings. Although it appears that at an August 15 hearing the court had forgotten that it had granted funds for witness Jennings, this oversight was not brought to the court's attention, and in fact Jennings testified. As for the remaining witness, Curtis Pope, the defense never specifically moved for funds to bring him to Georgia. See Appendix B to this opinion.

Of the five out-of-state witnesses, we find that Buck and Jennings testified, the court did not deny funds for Curtis Pope or William Howe, and the denial of funds for Reverend Walker was not error. We find no merit to this enumeration of error.

10. In his 20th enumeration, Pope complains of the suppression of exculpatory material.

(a) Pope argues that the statement of defendant's sister, who drove him to Bremen, should have been provided to the defense.

Prior to trial, defendant sought access to statements made by his sister, suggesting that perhaps the defense could put "some of the blame" on her. The defense presented evidence that she might be psychotic and her statements unreliable and argued that if she made untrue statements, the defense needed to know what she had said to give the defense an opportunity to deal with them if the state tried to bring them out at trial.

The court responded by prohibiting the state from using her testimony, while allowing the defendant to call her if he so chose. Nothing exculpatory was suppressed here.

(b) The location of the store's alarm button was not suppressed. Prior to trial, the court ordered the state to furnish that information. Presumably, the state did so, and in any event, the state disclosed the alarm button's location in its opening statement.

(c) While Kirk and Webb were in the back of the store and defendant was preparing to leave, a police officer drove up in response to the silent alarm that Webb had previously set off. Pope told the officer that everything was all right and that the alarm had been set off by accident. The officer left.

Pope made two pretrial motions regarding this incident. First, he moved to compel the disclosure of law enforcement records of responses made to silent alarms in 1983, 1984 and 1985. This motion was granted. In addition, he sought discovery of files belonging to the City of Bremen and to Haralson County relating to a possible lawsuit arising out of the incident. This motion was denied. Defendant was given the opportunity to examine the state's file, including all the police reports of the incident. No showing having been made that the files of the city or of the county contained anything exculpatory, defendant has shown no violation of *Brady v. Maryland*, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963).

(d) The state did not suppress evidence that Lisa Kirk had previously sworn out a false complaint against another party in the recent past. Kirk did not take out the warrant; her mother did. Defendant was aware of the crime charged in the warrant, knew the name of the accused and knew that it had later been dropped (and it does not necessarily follow that it was dropped because the complaint was false). Although the warrant itself was not disclosed to the defendant,

the court ultimately ruled that the defendant could cross-examine Kirk about the incident and could present the testimony of the person accused in the warrant. Defendant chose not to take either of these courses of action. We find no *Brady* violation.

(e) The state did not ignore a defense request for the production of the disciplinary records of any of the police officers who testified. The record does not show that Pope made such a request. Instead, he asked to be furnished with information regarding the criminal records of state's witnesses and the court responded by ordering the state to furnish the defendant with NCIC and MCI information on its witnesses.

(f) Finally, the state did not suppress photographs from a photographic lineup at which another was identified as the perpetrator of the crime. There was no such identification.

11. At the sentencing phase of the trial, during the cross-examination by the state of a defense witness, the state asked the witness whether the defendant carried a knife. She did not recall. Then the state referred to a pretrial interview of the witness at her residence, conducted by two officers whom the state named. After the witness testified that she recalled the interview, the state read from the police report that the witness had stated she knew the defendant to have owned a large pocketknife and could probably identify it if she saw it again. The witness did not recall making the statement, and could not identify a knife found at the scene, exhibited to her by the state.

In his 21st enumeration, Pope complains of the court's refusal to allow him to examine the police report.

The state points out that Pope had several prior opportunities to review the state's file, including this report. We note that the report itself was not offered in evidence, and neither was testimony given by either of the officers who participated in the interview. Hence, in actuality the witness was not impeached. *Alderman v. State*, 254 Ga., supra. In these circumstances, any possible error in refusing to allow the defendant to examine the report during the testimony of this witness is harmless. Cf. *Baxter v. State*, 254 Ga. 538 (18) (331 SE2d 561) (1985).

12. On the morning of August 22, 1985, a Thursday, voir dire having been completed, a jury selected, and opening statements made, the court discussed with the defense attorneys their arrangements for transporting their defense mitigation witnesses in a timely manner. After some discussion of the probable length of the trial, the court stated: "You need to have your witnesses here on the punishment phase as is necessary. Be prepared to have them by here no later than Monday anyway."

The state rested its case on the guilt phase early Friday afternoon. The defense called two witnesses, including Dr. Robert Stivers,

who testified, among other things, about a psychological condition known as "automatism," wherein a person, because of a blow to the head or for some other reason, loses consciousness but continues to perform on something akin to "automatic pilot," without being aware of it, or remembering it later.

The court recessed early Friday afternoon after being informed that defendant's sole remaining guilt-phase witness would not be available until the next day.

The next morning, the defense announced that the witness could not make it until Sunday and asked for a continuance. The discussion proceeded as follows:

"THE COURT: Is this the witness that called me last night?

"MR. WORD: Yes, sir. He works for the sheriff's department in Indianapolis. We're expecting him to be here. We're expecting a three-day case on behalf of the State. As soon as we found out it's breaking down we called him. He has a subpoena, of course, it's not honorable out-of-state. And he wasn't able to get his employer, the Marion County —

"THE COURT: You want to tell me what this witness is expected to testify about?

"MR. WORD: Yes, sir. His name is Marvin Johnson. And he's a former light-heavyweight champion of the world, and would be qualified as an expert in boxing and boxing injuries to substantiate what Dr. Stivers testified about on automatism, and that would be our anticipated testimony of him. What Dr. Stivers talked about, someone with firsthand experience on automatism, and that would be the basis of his testimony.

"THE COURT: Well, I've already offered to have him examined by a neurologist. I think that's primarily a medical problem. When the gentleman talked to me last night he said he knows nothing about this case and has never seen the defendant. And I don't know that his testimony is going to be of any benefit to anybody.

"Now, you apparently didn't want to have him examined by a neurologist, and a possibility of a CAT Scan. So, I'm not going to delay the trial any further while we wait for another witness which in my opinion is not going to add anything to this trial.

"MR. WORD: Your Honor, for the record, we did want him examined by a neurologist. We just did not want that neurologist also available to the State. We wanted our private —

"THE COURT: Mr. Word, I repeatedly told both of you, as far as that is concerned, there are no secrets and surprises. You've been very secretive throughout this trial about what you planned to do, and I think I've been more than cooperative. We've known about this for some time, and when we expected the trial to begin, and I think I indicated to you earlier I didn't think it was going to last as long as

you and Mr. Stafford Smith seemed to think. I'm not going to delay this trial any further while you get another witness from Indianapolis. I don't know what arrangements you've had to get him here. I didn't authorize anybody to be transported from Indianapolis for the guilt-innocence phase.

"MR. WORD: Your Honor, we were paying for that out of our own pocket.

"THE COURT: Well, I'm not going to delay it any further."

In his 22nd enumeration, Pope contends the court erred by denying the motion for continuance.

The state responds that its case proceeded faster than expected because much of what it had planned to spend a lot of time proving was conceded by the defense in opening statements, thereby obviating the necessity to call all its witnesses, and because there was little cross-examination of many of the witnesses the state did call.

" 'A refusal to grant a continuance will not be disturbed by appellate courts unless it clearly appears that the judge abused his discretion in this regard.' *Marshall v. State,* 239 Ga. 101 (1) (236 SE2d 58) (1977). See also, *Ealy v. State,* 251 Ga. 426 (3) (306 SE2d 275) (1983)." *Putman v. State,* 251 Ga. 605, 611 (308 SE2d 145) (1983). "In all cases, the party making an application for a continuance must show that he has used due diligence." OCGA § 17-8-20.

In view of the defense awareness of its own strategy, and the court's admonition to have defense *mitigation* witnesses ready *"no later* than Monday," we find that the defense should have anticipated that it might need to present its guilt-phase evidence prior to Sunday. We find no abuse of discretion in the denial of a continuance.[6]

13. In his 23rd enumeration of error, Pope contends that improper conduct by the prosecutor rendered the trial fundamentally unfair. "We note that many of the objections he attempts to raise on appeal were not made at trial and were therefore waived . . . Additionally, many simply do not constitute misconduct. To the extent that the prosecutor may have overstepped his bounds, he did not do so to an extent that resulted in reversible error. *Ford v. State,* 255 Ga. 81 (8 i) (335 SE2d 567) (1985)." *Davis v. State,* 255 Ga. 598, 610 (17) (340 SE2d 869) (1986). (Footnote omitted.)

14. Contrary to defendant's 24th enumeration, the "entire indictment" was not repeated every time a witness was sworn. The oath was properly administered in accordance with OCGA § 17-8-52.

15. The court did not err by failing to charge on automatism, absent a written request for such a charge. OCGA § 5-5-24 (b); *Slaugh-*

---

[6] We note that Johnson did testify at the sentencing phase of the trial and the jury, having finally heard his testimony, nonetheless concluded that Pope should be sentenced to death.

*ter v. Linder,* 122 Ga. App. 144 (2a) (176 SE2d 450) (1970).

Nor did the court err by refusing to charge on mutual combat. *Flowers v. State,* 146 Ga. App. 692 (247 SE2d 217) (1978).

We cannot agree that because the jury "was . . . authorized to sanction [Pope] for committing the robbery" (Appellant's Brief, p. 153), the court should have charged on the misdemeanor offense of reckless conduct, OCGA § 16-5-60, or on involuntary manslaughter. *Williams v. State,* 249 Ga. 6 (4) (287 SE2d 31) (1982).

Enumeration 25 is without merit.

16. The court charged on intoxication as follows:

"Our law provides that voluntary intoxication shall not be an excuse for any criminal act. It provides further that if a person's mind, when unexcited by intoxicants, is capable of distinguishing between right and wrong, and reason and acting rationally, and he voluntarily deprives himself of reason by consuming intoxicants, and while under the influence of such intoxicants, he commits a criminal act, he is criminally responsible for such acts to the same extent as if he were sober."

The court also charged: "If because of the influence of alcohol, drugs, or narcotics, one's mind becomes so impaired as to render him incapable of forming an intent to do the act charged, or to understand that a certain consequence would likely result from it, he would not be criminally responsible for the act. Whether or not that is true is a question for you, the jury, to determine."

In his 26th enumeration, Pope argues that these charges are "hopelessly contradictory" and violate the rule of *Sandstrom v. Montana,* 442 U. S. 510 (99 SC 2450, 61 LE2d 39) (1979), regarding presumptions and burden of proof. We find no error. In our view, the two charges are no more contradictory than, on the one hand, a charge that sanity is presumed and the burden is on the defendant to prove the contrary, and, on the other, a charge that the state must in all events prove criminal intent beyond a reasonable doubt. Compare OCGA §§ 16-3-2; 16-3-3; 16-3-4 and 16-2-1; *Brown v. State,* 250 Ga. 66 (2) (295 SE2d 727) (1982). As we noted in *Brown,* the United States Supreme Court has found no constitutional infirmity in a rule which places the burden upon the defendant to prove his insanity. *Rivera v. Delaware,* 429 U. S. 877 (97 SC 226, 50 LE2d 160) (1976); *Leland v. Oregon,* 343 U. S. 790 (72 SC 1002, 96 LE 1302) (1952).

" '[A] person may be capable of formulating a plan with an awareness that carrying out the plan will likely result in the death of another, and yet be incapable of understanding the difference between right and wrong. In a state in which the mens rea for murder is premeditation and the test of insanity is the M'Naghten Rule, there is no substantial overlap between the facts necessary to prove mens rea and the elements of insanity.' [Cit.]

"When mens rea is defined in terms of the conscious mind's cognitive and volitional functions, a legally insane defendant can act in such a way as to satisfy the formal, definitional elements of the crime. Guilt, in the sense of whether the defendant committed all the specified elements of the crime, can thus be established prior to the determination of whether the defendant had the capacity to conform his conduct to the law." Comment, The Use of Illegally Obtained Evidence to Rebut the Insanity Defense: A New Exception to the Exclusionary Rule?, 74 Journal of Criminal Law and Criminology, 391, 412-414. (Footnotes omitted.)

In this case, the court charged, in effect, that a temporary insanity resulting from drug or alcohol intoxication is no excuse, but lack of criminal intent is, whether or not the defendant is intoxicated. We find no error in the court's charge on voluntary intoxication.

Nor do we find error in the court's charges on permissible inferences of intent. Nothing in *Sandstrom* or in *Francis v. Franklin*, 471 U. S. ___ (105 SC 1965, 85 LE2d 344) (1985), condemns the use of permissive inferences. Permissive inferences are unconstitutional only if they are irrational. See *County Court of Ulster County, N. Y. v. Allen*, 442 U. S. 140 (99 SC 2213, 60 LE2d 777) (1979); *Williamson v. State*, 248 Ga. 47 (281 SE2d 512) (1981).

Finally, the court's instructions on kidnapping with bodily injury were not "faulty."

Enumeration 26 is without merit.

17. Prior to trial, Pope moved to exclude evidence of prior armed robbery convictions on the ground that they were the result of involuntary guilty pleas. The trial court denied the motion, and evidence of the convictions was admitted at the sentencing phase of Pope's trial.

The state's exhibits show on their face that Pope had pled guilty to a number of counts of armed robbery in 1975. It is clear that he had been represented by an attorney, but the record in this case is otherwise devoid of any evidence that the pleas were intelligent and voluntary. See *Boykin v. Alabama*, 395 U. S. 238 (89 SC 1709, 23 LE2d 274) (1969).

A plea of guilty that is invalid under *Boykin* may not be used to enhance punishment in a subsequent trial. See *Burgett v. Texas*, 389 U. S. 109 (88 SC 258, 19 LE2d 319) (1967). The state argues that we must find against the defendant because he did not prove that his guilty pleas were involuntary. However, from our examination of *Boykin* and *Marshall v. Lonberger*, 459 U. S. 422 (103 SC 843, 74 LE2d 646) (1983), we conclude that once the defendant raises the issue of intelligent and voluntary waiver with respect to prior guilty pleas, the burden is on the state to establish a valid waiver. *Boykin* states that " '[p]resuming waiver from a silent record is impermissi-

ble.' " Id. at 242. In *Marshall v. Lonberger*, the Court found that the findings of the Ohio courts were fairly supported by the record and should have been accepted by the federal Court of Appeals for the Sixth Circuit. Implicit in the Court's opinion, however, is that the prosecution bore the initial burden of proof in the Ohio trial court regarding the validity of the prior Illinois guilty plea which the prosecution sought to offer in aggravation.[7]

In most cases, a transcript of the plea colloquy will be sufficient to resolve the issue of voluntariness one way or the other. See, e.g., *Goodman v. Davis*, 249 Ga. 11 (287 SE2d 26) (1982). Whether or not that is true in this case, we cannot say, for although the defendant makes reference to transcripts of the plea colloquies, they were never admitted in evidence, and do not appear in the record on appeal.[8]

Absent a showing that defendant's previous guilty pleas were knowingly and voluntarily entered, the trial court erred by admitting them in evidence over defendant's objections.[9] If the state decides to "seek anew" the death penalty, *Crawford v. State*, 256 Ga. 57 (344 SE2d 215) (1986), the state may attempt to respond properly to defendant's objections.

18. One of the aggravating circumstances found by the jury was that the defendant "by his act of murder, armed robbery, or kidnapping, knowingly created a great risk of death to more than one person in a public place by means of a weapon or device which would normally be hazardous to the lives of more than one person." OCGA § 17-10-30 (b) (3). Pope argues that the evidence in this case is insufficient to establish the presence of this statutory aggravating circumstance. We agree.

This statutory aggravating circumstance has two components, both of which must be satisfied. First, the evidence must show that the defendant, "by his act of murder . . . knowingly created a *great risk* of death to more than one person in a public place . . ."[10] Sec-

---

[7] For example, at 459 U. S. 435, the Court states: "While disbelief of respondent's testimony may not form the basis for any affirmative findings by the state trial court on issues with respect to which the State *bore the burden of proof*, it certainly negates any inferences favorable to respondent such as those drawn by the [federal] Court of Appeals, based on his testimony before the Ohio trial court." (Emphasis supplied.)

[8] We note that the record in *Marshall v. Lonberger*, supra, shows that the state offered in evidence the indictment, plea of guilty, sentence, *and* a transcript of the Illinois plea colloquy.

[9] The state also points out that defendant pled guilty to Count 7 of the indictment in the instant case. Count 7 was a recidivism count, alleging that defendant had been convicted of the prior armed robberies, the validity of which he questions in this enumeration of error. The state argues that by this plea of guilty, defendant validated the prior guilty pleas. We will not attempt to answer this question now, inasmuch as no transcript of the guilty plea colloquy as to Count 7 appears in the record before us.

[10] Since the state here sought a death penalty only for the offense of murder, the "armed robbery or kidnapping" language should have been omitted from the court's charge.

ond, the evidence must show that this "great risk" resulted from the use of a "weapon or device" that is "normally hazardous to the lives of more than one person."

A pistol used in a public place may be hazardous to the lives of more than one person. See *Jones v. State*, 243 Ga. 820, 832 (256 SE2d 907) (1979). But, depending on how it is used, it does not necessarily create a "great risk of death to more than one person." "Great risk" does not mean mere possibility, but likelihood or high probability. Cf. *Kampff v. State*, 371 S2d 1007 (Fla. 1979). Firing a gun into a crowd can create a great risk of death to more than one person. Cf. *Chenault v. State*, 234 Ga. 216 (215 SE2d 223) (1975). Shooting someone from fairly close range does not, by itself, create a "great risk of death" to more than one person simply because others may be in the vicinity. *Phillips v. State*, 250 Ga. 336 (5) (297 SE2d 217) (1982).

Here, Pope did not by his act of shooting Lee Webb create a great risk of death to Lisa Kirk. Thus, the jury's finding of the § (b) (3) aggravating circumstance is not supported by the evidence.

We point out, however, that Pope's commission of the offense of murder is aggravated by his commission of an aggravated battery upon Lisa Kirk. See OCGA § 17-10-30 (b) (2); *Davis v. State*, 255 Ga. 588 (3c) (340 SE2d 862) (1986); *Cook v. State*, 255 Ga. 565 (16) (340 SE2d 843) (1986). If this case is retried as to sentence, the state would not be precluded from alleging the existence of this aspect of the § (b) (2) aggravating circumstance. *Spraggins v. State*, 255 Ga. 195, 204-205 (336 SE2d 227) (1985) (Gregory, J., concurring specially).

19. In his 29th enumeration, defendant argues that because the court's charge authorized a finding of the § (b) (2) statutory circumstance if the defendant committed murder while engaged in the commission of armed robbery *or* kidnapping with bodily injury, the jury's finding of this circumstance may not have been unanimous. The jury's verdict, however, clearly specified that it found both supporting felonies, and we find no merit to this argument.[11]

In addition, defendant argues that the commission of an armed robbery and the commission of the offense of kidnapping with bodily injury do not aggravate the crime of murder sufficiently to allow the imposition of a death sentence. We find no merit to this claim. The jury was authorized to find that Pope's commission of these offenses contemporaneously with the commission of the crime of murder "reasonably justif[ies] the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U. S. 862 (103 SC 2733, 77 LE2d 235) (1983). (Footnote

---

[11] The jury found that "the offense of murder was committed while the offender was engaged in the commission of another capital felony, to wit; the defendant was engaged in the commission of armed robbery *and* kidnapping with bodily injury." (Emphasis supplied.)

omitted.)

20. The state did not improperly inject the question of parole by introducing defendant's prior convictions, which showed that he had been sentenced to life imprisonment in 1975. Cf. *Felker v. State*, 252 Ga. 351 (19) (314 SE2d 621) (1984). Defendant should not have been allowed to argue that Pope would not be paroled so easily if he were to receive another life sentence; but that he did so argue did not require the trial court to instruct the jury on defendant's parole eligibility. See *Davis v. State*, 255 Ga. 598 (25) (340 SE2d 869) (1986). Enumeration 30 is without merit.

21. The jury should not have been instructed on the § (b) (3) aggravating circumstance, as we explain above. Otherwise, the court's instructions on aggravating and mitigating circumstances were proper and sufficient. *Romine v. State*, 251 Ga. 208 (10) (305 SE2d 93) (1983).

22. In his 32nd enumeration of error, Pope complains of the exclusion of evidence in mitigation. In Division 9 of this opinion, we ruled adversely to his claim that he should have been allowed to present testimony on the nature of an electrocution. The other claim raised here involves the court's refusal to order the disclosure of Pope's parole file, or at least so much of it as might be mitigating.

The state relies upon OCGA § 42-9-53, which classifies records in the possession of the State Board of Pardons and Paroles and forbids the disclosure of information contained therein except under certain conditions not applicable here. There are doubtless a number of reasons for maintaining the confidentiality of such records, including the protection of persons who have provided information adverse to the prisoner. See also *Morris v. State*, 246 Ga. 510 (272 SE2d 254) (1980). However, these interests do not outweigh a capital defendant's need for access to potentially mitigating evidence. Cf. *Skipper v. South Carolina*, ___ U. S. ___ (39 CrLR 3041) (Case # 84-8859, decided April 29, 1986) (holding that the state of South Carolina violated the constitution in a death penalty case by refusing to allow defendant to proffer evidence regarding his good behavior while in prison).

We hold that in the event of a retrial as to sentence in this case, the appropriate procedure to be followed is that specified in *Walker v. State*, 254 Ga. 149 (4) (327 SE2d 475) (1985), i.e., upon a timely and proper request, the trial court should obtain the parole file of the defendant and review it in camera. Those portions of the file, if any, which are potentially mitigating should be disclosed to the defendant.

23. The trial court did not err by charging that a defendant is not justified in using deadly force in self-defense if he is attempting to commit or committing a felony, or is fleeing after the commission or attempted commission of a felony, OCGA § 16-3-21 (b) (2), even if such a charge, on the facts of this case, "eviscerated" defendant's de-

fense of self-defense. A defendant is not entitled to present a theory of self-defense that contravenes the law, simply because it might be more favorable to him. Enumeration 33 is without merit.

24. In his 34th enumeration, Pope argues that his death sentence must be set aside because the jury did not find intent to kill. See *Enmund v. Florida*, 458 U. S. 782 (102 SC 3368, 73 LE2d 1140) (1982). Inasmuch as he was found guilty of malice murder, we find no error. See *Curry v. State*, supra, 255 Ga. at 223; *Walker v. State*, supra, 254 Ga. at 160.

25. We find no merit to the constitutional attacks on our death penalty procedures raised in enumerations 35 and 36. *McCleskey v. Kemp*, 753 F2d 877 (11th Cir. 1985) (cert. granted __ U. S. __ (July 7, 1986)); *Johnson v. Zant*, 249 Ga. 812 (10) (295 SE2d 63) (1982).

26. By way of a supplemental brief, Pope raises an issue that, he contends, has come to his attention only since the filing of the appeal. It appears that one of the assistant district attorneys who helped prepare the state's brief was the trial court's law clerk throughout the trial of this case. At our direction, both parties have submitted briefs on this issue, and have included with their briefs, affidavits from the former law clerk, the trial judge, and the two defense attorneys.

It is undisputed that in May of 1985, the former law clerk accepted employment with the district attorney who tried this case, and that after having accepted the district attorney's offer of employment, the future assistant district attorney remained the trial court's law clerk throughout the trial of this case. The former law clerk and the trial judge concede that the law clerk attended pretrial and trial proceedings and provided assistance to the court, except that the law clerk did not assist or participate in any of the court's in-camera inspections.

The state contends, by brief and by its affidavits, that the former law clerk's future employment was "common knowledge" throughout the circuit and was referred to informally before and during the trial of the case by personnel in the district attorney's office and by the defense attorneys. The defendant claims, by brief and by affidavits, that neither he nor his attorneys knew that the trial judge's law clerk had accepted employment with the district attorney until her name was noticed on the state's brief, and that they would have objected if they had known.

"Law clerks are not merely the judge's errand runners. They are sounding boards for tentative opinions and legal researchers who seek the authorities that affect decision. Clerks are privy to the judge's thoughts in a way that neither parties to the lawsuit nor his most intimate family members may be . . .

"Whether or not the law clerk actually affected the [trial judge's] decision[s], her continuing participation with the [judge] in a case in

which her future employers were counsel gave rise to an appearance of partiality. See [cits.] (judge not disqualified when law clerk 'immediately taken off *all* work . . . in cases being tried . . . by his prospective employers.') . . . See also A. DiLeo and A. Rubin, Law Clerk Handbook § 2250 (1977) (when clerk accepts position with firm, must cease involvement in cases in which future employers have interest)." *Hall v. Small Business Admin.*, 695 F2d 175, 179 (5th Cir. 1983).

In this case, the trial judge did not recuse himself, nor, alternatively, did his law clerk cease her involvement in a case in which her future employer was counsel. On the other hand, the defense filed no motion to recuse and, in fact, moved to retain the original trial judge after venue was changed to Cobb County.

Motions to recuse must be timely, i.e., made "as soon as the facts demonstrating the basis for disqualification become known." *Hunnicutt v. Hunnicutt*, 248 Ga. 516 (283 SE2d 891) (1981).

Ideally, the trial judge should have made a disclosure on the record of his law clerk's future employment. The defendant might have decided to waive any right of recusal and this waiver could have been placed on the record. Otherwise, the trial judge should at least have excused his law clerk from any further participation in this case.

No such disclosure appears in the record of this case. Nonetheless, if the defendant was aware of a possible basis for recusal, he had no right to sit back, await a possibly favorable verdict, and then raise the issue for the first time after trial. *Jones v. Ivory*, 255 Ga. 20 (334 SE2d 666) (1985).

On the question of notice and prior knowledge, the affidavits are in conflict. This court is ill-equipped to make the factual determinations necessary to a proper resolution of this issue. We therefore remand this case to the trial court for a hearing. If the defendant or his attorneys knew of a possible basis for recusal prior to trial and failed to raise it in a timely manner, the conviction may be affirmed. If the issue was raised at the first opportunity after the discovery of the relevant facts, the conviction must be reversed.

27. The sentence of death is reversed. The case is remanded for further proceedings as outlined in Division 26 of this opinion.

*Judgment reversed in part, remanded in part. All the Justices concur, except Marshall, C. J., and Weltner, J., who dissent as to Division 7 (e) and the reversal of the death sentence.*

WELTNER, Justice, dissenting.

I dissent.

In Division 7 (e), the majority is vacating a death sentence because of a question concerning the qualification of a juror on the panel who was never put upon either the state or the defense. The trial jury was selected when Pope accepted juror number 38 and he

had 4 strikes remaining. Under these circumstances, it is difficult to suggest — at the cost of re-trial — that the jury selection process was anything other than fair.

I am authorized to state that Chief Justice Marshall joins in this dissent.

DECIDED JULY 16, 1986 —
RECONSIDERATIONS DENIED JULY 30, 1986.

*Word, Cook & Word, Gerald P. Word, Julie I. Edelson,* for appellant.

*William A. Foster III, District Attorney, Jeffrey L. Ballew, Assistant District Attorney, Michael J. Bowers, Attorney General, J. Michael Davis, Assistant Attorney General,* for appellee.

APPENDIX A.

THE COURT: If you would state your name and your occupation, please, sir.

THE JUROR: James M. Brownlow; retired.

THE COURT: Have you for any reason formed, expressed any opinion in regard to the guilt or the innocence of the accused?

THE JUROR: No.

THE COURT: Have you any prejudice or bias resting on your mind either for or against the accused?

THE JUROR: I don't understand the question.

THE COURT: Do you have any prejudice or bias resting on your mind either for or against the accused?

THE JUROR: No, sir.

THE COURT: Is your mind perfectly impartial between the State and the accused?

THE JUROR: No.

THE COURT: Is it impartial?

THE JUROR: No, it's impartial.

THE COURT: Sir?

THE JUROR: No, partial.

THE COURT: Impartial?

THE JUROR: Oh, yeah, it would be impartial.

THE COURT: All right, sir. Now, are you related either by blood or marriage to any of the following persons: Lee Watson Webb, III, Lisa Kirk, Bill Hamrick, Gail Bowers, or Wayne Kidd?

THE JUROR: No.

THE COURT: Are you conscientiously opposed to capital punishment?

THE JUROR: Could I answer that in my way?

THE COURT: Yes, sir.

THE JUROR: Any crime that would call for capital punishment regardless of creed, color, or race I'm for it a hundred percent.

THE COURT: All right, sir. Mr. Foster, you have any questions?

## EXAMINATION

### BY MR. FOSTER [for the state]:

Q Mr. Brownlow, my name is Bill Foster. I'm the district attorney in Paulding County, in the Tallapoosa Circuit. And Paulding County and Polk County and Haralson County are the three counties that make up the Tallapoosa Circuit. We're west of Cobb in Dallas over there.

The crime which we're fixing to strike a jury, we're going to try arose in Bremen, Georgia. Do you know where Bremen is?

A Oh, yeah.

Q Out I-20, Bremen is in Haralson County. The case was indicted by a Grand Jury from Haralson County and John David Pope was indicted there for the offense of murder, armed robbery, two counts of aggravated assault, and two counts of kidnapping. And then was transferred here for trial in Cobb County. The judge and prosecutors and all came with the case, and we're going to try it here.

I need to know since this is a case which the State will be seeking the death penalty if in — what your attitudes are about the death penalty. Now, you say you are for it; is that correct?

A If a crime is committed that would call for it, I'm for it a hundred percent. Right.

Q You understand Georgia law provides for the death penalty only in certain — for certain crimes?

A Yeah.

Q And then only under certain circumstances, you understand that?

A Oh, yeah.

Q And you would not be for it automatically, would you?

A Well, a death — anybody commits a sin — a crime of death, that's death; isn't it? They kill somebody. Yeah, I would be for it.

Q You would be for it?

A Yes, sir.

Q But you wouldn't automatically give the death penalty, would you? Would you listen to all the evidence before you made up your mind?

A I would listen to all the evidence; but like I said in the beginning, if they were found guilty beyond a shadow of a doubt, that ought to clarify that.

Q Okay. We're assuming then the jury — and under Georgia law the jury first makes the decision about guilt or innocence. That's the only thing you consider. You understand?

A I didn't understand that.

Q Well, the trial is a two-part thing.

A Yeah.

Q The first thing is nothing but guilt or innocence. Did he do it or didn't he do it. The jury makes that decision. And after that decision is made, if the defendant is found guilty, then the jury considers punishment. In other words, you got a two-phase trial.

A Yeah.

Q So we're assuming that the defendant has been found guilty, and the judge has told you that for the crime that he's been found guilty of and under those circumstances the law provides the jury has an option of deciding either life or death. You understand that?

A Oh, yeah.

Q Okay. Now, in such a situation, assuming the jury you're on had already found the defendant guilty. Then you would listen to whatever evidence was put up in mitigation and aggravation before you made your decision about whether or not to give the death penalty; would you not?

A Yeah, I'd listen.

Q You'd listen to all the evidence before you made your decision?

A Yes. I would listen to all the evidence before I made a decision.

Q About anything involving about the death penalty?

A Right.

Q In other words, you wouldn't vote automatically to give somebody a death penalty?

A Unless like I said in the beginning if they were found guilty without a shadow of a doubt and the crime called for it, yeah. If that's what you're referring to, yeah, I'd stick with it.

Q You'd stick with it?

A Yes, sir.

Q But you'd listen to whatever evidence was put up?

A I would listen to it, but it wouldn't change my opinion.

Q Okay. Now, you feel that under any circumstances then you would vote for the death penalty?

A Yeah, in those circumstances, what I said, yeah. I sure would.

Q That would be only in cases where it was authorized by the Court; is that correct? Where the Court told you as a juror you were authorized to consider the death penalty?

A Well —

Q In other words, if the Court didn't allow you to, you couldn't vote for the death penalty, could you?

A No.

Q And if the defendant had mitigating circumstances, things that he felt like you should consider in mitigation, you would listen to all of that; wouldn't you?

A I'd listen to all of it before I would make a decision.

Q Your decision is not just going to be automatic; is it?

A Well, no.

MR. FOSTER: Thank you, sir.

A (Continuing) Only if he's found guilty.

MR. FOSTER: Thank you, Mr. Brownlow.

THE COURT: Mr. Word?

MR. WORD: Thank you, your Honor. May I follow up on that, your Honor? Seems to be some serious question as to that issue.

## EXAMINATION

### BY MR. WORD [for the defense]:

Q Mr. Brownlow, my name is Jerry Word from Carrollton, and I want to ask you just a few questions. I represent Mr. Pope. Now, assuming the defendant was found guilty and you had voted along with the rest of the jurors for guilt. You found him guilty beyond a reasonable doubt. And the judge said to you now you're authorized to consider the death penalty at this point. It is my understanding then at that point you would always vote for the death penalty if the judge said you're authorized to do it?

A Right. If found guilty without a shadow of a doubt.

Q And in any incident where he says you were authorized you would vote for the death penalty; is that correct?

A If the judge didn't authorize it I certainly wouldn't.

Q If he said you were authorized but you didn't have to?

A Yeah, I would.

Q And would that be regardless of anything the defendant might put up in way of mitigation, why he did it or anything like that, once you found him guilty? Would you, if the judge said you're authorized and the defendant got up and gave certain reasons for mitigation, would you still vote for the death penalty?

A Right.

Q Regardless even if the judge said although you're authorized you don't have to; would you still vote for it?

A Yeah.

MR. WORD: Your Honor, under reversed Witt we would move — reversed Witherspoon —

THE COURT: You understand you're not required to return a death penalty in any particular situation but you can always recommend a life sentence?

THE JUROR: Yes, sir.

THE COURT: Would you consider any mitigating circumstances that would tend to mitigate the crime as far as the punishment is concerned?

THE JUROR: Yes, sir.

THE COURT: I'll overrule your challenge.

MR. WORD: Your Honor, we, of course, for the record take exception to that.

### APPENDIX B.

The trial record shows the following sequence of events.

On February 27, 1985, Pope filed in Haralson County a "Motion for Funds for the Defense to Secure the Attendance of Out of State Witnesses." The motion stated that Pope was "prepared to make a detailed statement concerning the necessity for witnesses . . . including the names of the prospective defense witnesses . . .," and sought a hearing on the matter. No witnesses were named in the motion.

On March 4, 1985, defendant filed with the clerk of the court affidavits from Howe and Buck, which stated that these two witnesses had relevant information about the case but lacked funds to travel to Georgia to testify.

On the same date, a hearing was held on the above motion (and 60 others). Defense attorney Stafford Smith informed the court that affidavits had been received from two out-of-state witnesses. He argued that the affidavits contained enough information to show the necessity for the presence of these two witnesses. The court ruled, "Well, I'll grant your motion, and we'll determine what we need to do about getting them here."

On March 20, 1985, the defense filed an affidavit from Curtis Pope that was similar to the previous ones.

On April 15, 1985, the parties met in Haralson County for the trial of the case. As noted previously, the attempt to select a jury convinced the trial court that a change of venue was necessary. However, prior to the commencement of voir dire, the court held a short Unified Appeal Procedure hearing to rule on any motions not yet disposed of. See Rule III (A) (1) of the Unified Appeal Procedure. Among other matters, Stafford Smith sought to "straighten out what we're going to do in terms of all our witnesses . . . One has to come from Arizona. One has to come from Texas and two have to come from Florida. It's going to take a day or two to get them here." After debating the probable length of the voir dire, the discussion proceeded as follows:

"MR. STAFFORD SMITH: Your Honor, the basic thrust of my question, though, was that your Honor hadn't ordered funds for these witnesses. They don't care when they're coming, but we need to get

funds at some stage.

"THE COURT: Well, I believe I granted the standard out-of-state witnesses, as to the two, I recall. I don't recall more than two.

"MR. STAFFORD SMITH: I didn't understand we got that.

"MR. WORD: I understand you wouldn't issue the funds until we got to that time, and you would give us sufficient recess to get them here, is what I thought.

"THE COURT: Well, I was under the impression that the statutory out-of-state witness subpoena act specifies the funds, and I believe that's what I indicated I would pay.

"MR. WORD: Okay. We just wanted to be clear on that. There were a couple of more witnesses — maybe we could take them up now or take them up at a later time — we discovered since the hearing we had on that that we needed to be here to testify as to the punishment phase only, if we get that far. Of course, we could give you their names now, if your Honor wants to.

"THE COURT: Okay. What are their names and what briefly will they testify to. I'll tell you whether we'll allow them to be paid by the State.

"MR. WORD: One of them, your Honor, is Charles Jennings, and basically, Mr. Jennings had been in a situation where Mr. Pope was a hero in this particular case, and in a way of mitigation, Mr. Jennings can provide information that Mr. Pope saved his life, basically, and we'd like to bring him.

"THE COURT: Where is he located?

"MR. WORD: He's in Jacksonville, Florida. I have a phone number and address, if you want that right now.

"THE COURT: No, I don't need that.

"MR. WORD: And there is a gentleman by the name of Ron Walker, who is a retired chaplain who's in Trenton, Florida. And I have his name and address, also. And both of those gentlemen basically are on call whenever we notify them.

"THE COURT: And what would be the nature of this gentleman's testimony?

"MR. WORD: Your Honor, he's a retired chaplain, and had been with the Florida prison system, and had witnessed one execution and the nature of his testimony would be, in a tasteful manner to describe the procedure in an execution, and that would be the nature of that particular witness.

"Mr. Stafford Smith has one other, I think. You said there was a third one? Okay. That may be only — maybe four, then. The two you knew about and then these two.

"THE COURT: The first one you mentioned, I'll allow you to use State funds as statutory out-of-state witness fees to get him. I'll reserve ruling on the second one until I check further into it."

The issue came up once again at a hearing on August 15, 1985, four days before the trial was to begin in Cobb County. It was discussed as follows:

"THE COURT: I think that takes care of all the motions that we have that are pending at this time; is that correct?

"MR. STAFFORD SMITH: Your Honor, there are one or two that you have reserved ruling on until later on in the trial.

"THE COURT: Well, most of them I understand have to do with the punishment part of the trial; is that correct?

"MR. STAFFORD SMITH: That's correct.

"THE COURT: Is there any reason we need to hear them at this time?

"MR. STAFFORD SMITH: No. I should point out in terms of our out-of-state witness motion, we're going to have to have time to fly them in.

"THE COURT: If you tell me what you're particularly concerned about, I'll tell you what my ruling is right now.

"MR. STAFFORD SMITH: Well, your Honor, you just said you were going to wait until the guilt phase about to determine whether we would need them. You know, I think that's fine except if you tell us then, and we got to get them in —

"THE COURT: I'll go ahead and rule on it if — which motion is it of the one hundred and nine that we have?

"MR. STAFFORD SMITH: We'll come up with it eventually. The only point we wanted to make, we have to have time to get them here. We obviously can't —

"THE COURT: Well, tell me what these witnesses are going to testify to. I assume this is in the punishment phase, if we get to it; is that correct? You tell me what they're going to testify and I'll tell you how I'll rule as to the admissibility of their evidence.

"MR. STAFFORD SMITH: We filed, your Honor — we filed affidavits as to some of them. And by way of proof, one thing, does your Honor want us to describe them all in front of the State again? We have certain objections to disclosing everything again under the Fourteenth Amendment.

"MR. FOSTER: I'm curious if I'm even going to get to come to this trial.

"THE COURT: If he has a motion, he's going to present it in open court and you'll have an opportunity to object to it and present anything in opposition to it that you want.

"MR. STAFFORD SMITH: Right. It's No. 85, we've tracked it down. The witnesses — there were four members of Mr. Pope's family. Let's see, there's a Mr. B. A. Bach [sic].

"THE COURT: I thought I had already ruled on that one. I granted your motion to allow transportation for two witnesses. I be-

lieve one was from Texas and the other one was from Florida; is that correct?

"MR. WORD: Yeah, I think that's right.

"THE COURT: Now, these were relatives of his to testify in mitigation; is that correct?

"MR. WORD: Yes, sir. And you had reserved ruling on the person that was going to testify that had witnessed an execution from Florida, also.

"THE COURT: Well, I'm not allowing anybody to testify as to witnesses in execution, no matter where it comes from. The only thing in mitigation is the defendant's character or record or any other circumstances of the offense, just the death penalty in general is something you need to take up with the Legislature and not the Court.

"MR. STAFFORD SMITH: As we said in our motion, just by way of proffer, that we do guarantee he's not trying to say it's unconstitutional, he's trying to describe it under the Sixth Amendment. The jury understands what it is exactly what they're doing.

"THE COURT: My understanding of mitigating factors or circumstances is the defendant's character or record or any other circumstances of the offense. It can be anything, but it has to relate to the defendant or the defendant's background. The generalization on death penalty or excuses or whatever, I'll not allow testimony on.

"MR. WORD: Your Honor, I'm not arguing with the Court's ruling, but to make sure it's clear in the record and so the Court doesn't think we're trying to mislead them, this sole issue at penalty, are we going to kill him or are we going to let him have life in prison. And we think the jury is entitled to be educated as to what they're fixing to do. They know what life in prison means —

"THE COURT: I'm certain they know what death is. So, I'll let it go at that.

"MR. WORD: That would be our presentation. I understand the Court's ruling it out.

"MR. STAFFORD SMITH: There was one other witness. Did we get a clear ruling — there was also a B. A. Bach [sic] who's from Arizona.

"THE COURT: I'm going to allow the two witnesses that I previously authorized to pay the expenses to get them here whoever they might be.

"MR. STAFFORD SMITH: Then I think that's the end."

After the August 15 hearing, Pope made no further request for funds to secure the attendance of out-of-state witnesses.